# No. 22-50915

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

CHRISTOPHER GRISHAM, JAMES EVERARD,
*Plaintiffs - Appellants*

v.

RENE VALENCIANO, OLMOS PARK CHIEF-OF-POLICE; J. LOPEZ,
OFFICER; HECTOR RUIZ, OFFICER; A. VIERA,
CITY OF OLMOS PARK;
*Defendants - Appellees*

---

### On Appeal from the United States District Court
### for the Western District of Texas, San Antonio Division
### 5:20-CV-387

## BRIEF FOR APPELLANTS

*Counsel listed on Inside Cover*

**Brandon J. Grable**
Texas State Bar No. 24086983
brandon@g2.law
**Grable Grimshaw, P.L.L.C.**
1603 Babcock Road Suite 280
San Antonio, TX 78229
Telephone: (210) 963-5297
Facsimile: (210) 641-3332
**ATTORNEY FOR**
**PLAINTIFFS-APPELLANTS**

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record for Appellant certifies that the following listed persons and entities as described in the fourth sentence of 5ᵗʰ CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
| --- | --- |
| City of Olmos Park | Patrick Bernal of Denton, Navarro, Rocha, Bernal & Zech, P.C. San Antonio, TX |
| J. Lopez | Patrick Bernal of Denton, Navarro, Rocha, Bernal & Zech, P.C. San Antonio, TX |
| Hector Ruiz | Patrick Bernal of Denton, Navarro, Rocha, Bernal & Zech, P.C. San Antonio, TX |
| Rene Valenciano | Patrick Bernal of Denton, Navarro, Rocha, Bernal & Zech, P.C. San Antonio, TX |
| A. Viera | Patrick Bernal of Denton, Navarro, Rocha, Bernal & Zech, P.C. San Antonio, TX |

| Appellants: | Counsel for Appellants: |
| --- | --- |
| James Everard | Brandon Grable of Grable Grimshaw, P.L.L.C. San Antonio, TX |
| Christopher Grisham | Brandon Grable of Grable Grimshaw, P.L.L.C. San Antonio, TX |

/s/ Brandon J. Grable
BRANDON J. GRABLE
Attorney of Record for Plaintiffs-Appellants
Date: March 15, 2023

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants respectfully request the Court grant oral argument. This case involves questions of constitutional import that may impact future decisions of this Court and lower courts.  A clear understanding of the facts and evidence will be lacking absent an oral dialogue. Plaintiffs-Appellants submit that oral argument is necessary, and it will be helpful in clarifying the issues, and the audio, visual and testimonial evidence for the Court.  Accordingly, Plaintiffs-Appellants believe that oral argument would aid the decisional process and benefit the Court.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................. ii

TABLE OF AUTHORITIES ..................................................................5

JURISDICTIONAL STATEMENT ......................................................12

STATEMENT OF THE ISSUES...........................................................13

INTRODUCTION ..................................................................................14

STATEMENT OF THE CASE................................................................16

    Statement of Facts ................................................................................16

      A.    Everard and Grisham Were Engaged in First Amendment Protected Symbolic and Political Speech Utilizing Their Firearms as Expressive Conduct in a Safe and Lawful Manner. ..............................................21

      B.    Chief Valenciano and his Officers knew Everard and Grisham were engaged in First Amendment protected speech based on their knowledge leading up to March 27, 2018. ............................................................25

      C.    Based on the totality of circumstances, Chief Valenciano and his Officers were objectively unreasonable in believing probable cause existed for arresting Everard and Grisham on March 27, 2018 ........................................26

PROCEDURAL HISTORY....................................................................33

SUMMARY OF THE ARGUMENT .....................................................34

STANDARD OF REVIEW ...................................................................41

ARGUMENT .........................................................................................43

    I.    Plaintiffs-Appellants James Everard and Christopher Grisham Were Engaged in First Amendment Protected Symbolic and Political Speech. ...........43

      A.  First Amendment protected speech. ...........................................43

      B.    Protected speech includes the right to persuade others to change their views...........................................................................45

    II.    The District Court Erred in Granting Defendants-Appellees' Summary Judgment as the Record Establishes Genuine Issues of Material Fact with Respect to Valenciano and His Officers "Squashing" Everard and Grisham's First Amendment Right to Engage in Protected Symbolic and Political Speech.........48

A.    Valenciano and his Officers knew on March 27, 2018, that Everard and Grisham were open-carry activists protesting the Ordinance ...........................48

B.    Everard and Grisham clearly informed Valenciano and his Officers in loud, clear voices they were there to protest the Ordinance. ............................52

III.   The District Court Erred in Granting Defendants-Appellees' Summary Judgment Because there are Material Fact Issues Concerning Whether the Conduct of Valenciano and his Officers Violated Everard and Grisham's Clearly Established Rights. ..............................................................................................53

A.    The summary judgment record shows that Everard and Grisham were unlawfully arrested.........................................................................................53

B.    Everard and Grisham did not pose a safety threat. ..................................61

C.    Everard and Grisham did not interfere with Officer duties. ....................64

D.    Chief Valenciano and his Officers used excessive force which directly harmed Everard and Grisham. .........................................................................67

E.    Valenciano and his Officers retaliated against Everard and Grisham for condemning police conduct. ............................................................................74

IV.   The City of Olmos Park Ratified Chief Valenciano's Policy to "Squash the Rebel," Subjecting it to *Monell* Liability, by Failing to Curtail Chief's Retaliatory Actions Depriving Everard and Grisham of their First Amendment Right to Protest. ...........................................................................................................79

CONCLUSION ......................................................................................................81

PRAYER ................................................................................................................82

CERTIFICATE OF SERVICE .............................................................................83

CERTIFICATE OF COMPLIANCE ....................................................................84

# TABLE OF AUTHORITIES

**Cases**                                                                    **Pages(s)**

*Alexander v. City of Round* Rock,
    854 F.3d 298, 309 (5th Cir. 2017) .................................................................67

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...…………………………………………………35, 41, 42

*Batyukova v. Doege*,
    994 F.3d 717, 730 (5th Cir. 2012) ................................................................75

*Bazan v. Hidalgo County*,
    246 F.3d 481 (5th Cir. 2001) ........................................................................41

*Board of County Comm'rs of Bryan County v. Brown*,
    520 U.S. 397 (1997)......................................................................................79

*Boos v. Barry*,
    485 U.S. 312 (1988)......................................................................................43

*Brosseau v. Haugen*,
    543 U.S. 194, 201 (2004)..............................................................................69

*Brown v. Callahan*,
    623 F.3d 249 (5th Cir. 2010) ........................................................................42

*Brown v. Ent. Merchants Ass'n*,
    564 U.S. 786 (2011)......................................................................................43

*Club Retro LLC v. Hilton*,
    568 F.3d 181 (5th Cir. 2009) ..................................................................38, 53

*Colson v. Grohman*,
    174 F.3d 498 (5th Cir. 1999)........................................................................74

*Cooley v. Housing Auth. of City of Slidell*,
    747 F.3d 295 (5th Cir. 2014) ........................................................................41

**Cases**                                                                                     **Pages(s)**

*Crostley v. Lamar Cty.*,
    717 F.3d 410 (5th Cir. 2013) ....................................................................26, 39

*De Jonge v. Oregon*,
    299 U.S. 353 (1937)........................................................................................43

*Deville v. Marcantel*,
    567 F.3d 156 (5th Cir. 2009) ........................................................................69

*Ex Parte Poe*,
    491 S.W.3d 348 (Tex. App.—Beaumont 2016) ......................................*passim*

*Florida v. Harris*,
    568 U.S. 237, 243-44 (2013) .........................................................................53

*Freeman v. Gore*,
    483 F.3d 404, 414 (5th Cir. 2007) ...........................................................65, 69

*Gomez v. Chandler*,
    163 F.3d 921, 923 (5th Cir. 1999) ................................................................68

*Grandstaff v. City of Borger*,
    767 F.2d 161, 170 (5th Cir. 1985) ................................................................79

*Graham v. Connor*,
    490 U.S.386 (1989)..........................................................................67, 68, 69, 70

*Hanks v. Rogers*,
    853 F.3d 738 (5th Cir. 2017) ...................................................................42, 67

*Hill v. Colorado*,
    530 U.S. 703 (2000)...................................................................................45, 76

*Hogan v. Cunningham*,
    722 F.3d 725 (5th Cir. 2013) ........................................................................34

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*,
    515 U.S. 557 (1997)........................................................................................42

**Cases** <span style="float:right">**Pages(s)**</span>

*Hustler Magazine v. Falwell,*
    485 U.S. 46 (1988)........................................................43

*Ikerd v. Blair,*
    101 F.3d 430, 435 (5th Cir. 1996) ..............................68

*Jones v. Parmley,*
    465 F.3d 46, (2nd. Cir. 2006) ......................................43

*Joseph on behalf of Est. of Joseph v. Bartlett,*
    981 F.3d 319, 332-33 (5th Cir. 2020)..........................68

*Keenan v. Tejada,*
    290 F.3d 252 (5th Cir. 2002)..........................74, 76, 77

*Kinney v. Weaver,*
    367 F.3d 337 (5th Cir. 2004) ......................................42

*Kovacic v. Villarreal,*
    628 F.3d 209 (5th Cir. 2010) ......................................42

*Lemoine v. New Horizons Ranch & Center, Inc.,*
    174 F.3d 629 (5th Cir. 1999) ......................................41

*Lovett v. State,*
    523 S.W.3d 342 (Tex. App.—Fort Worth 2017)..........56, 57, 61, 62

*Lozman v. City of Riviera Beach, Fla,.*
    138 S.Ct. 1945 (2018)..................................................77

*Lytle v. Bexar Cnty.,*
    560 F.3d 404, 412 (5th Cir. 2009) ..............................69

*Magee v. Reed,*
    912 F.3d 820 (5th Cir. 2019) ......................................41

*Mesa v. Prejean,*
    543 F.3d 264, 273 (5th Cir. 2008) ..............................75

**Cases**                                                                 **Pages(s)**

*Michigan v. De Fillippo*,
    443 U.S. 31 (1979)..................................................................34

*Monell v. Department of Social Services*,
    436 U.S. 658 (1978)................................................................ 79

*NAACP v. Alabama ex rel. Patterson*,
    57 U.S. 449 (1958)..................................................................43

*NAACP v. Button*,
    373 U.S. 415 (1963)...........................................................43, 45

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982)..........................................................45, 74

*Newman v. Guedry*,
    703 F.3d 757, 763 (5th Cir. 2012) ......................................70

*Nieves v. Bartlett*,
    139 S.Ct. 1717 (2019 ......................................................34, 77

*Peterson v. City of Fort Worth*,
    588 F.3d 838 (5th Cir. 2009) ...............................................79

*Piotrowski v. City of Houston*,
    237 F.3d 567 (5th Cir. 2001) ...............................................79

*Poole v. City of Shreveport*,
    691 F.3d 624, 638 (5th Cir. 2012) ......................................68

*Sam v. Richard*,
    887 F.3d 710, 714 (5th Cir. 2018) .................................67, 73

*Sanchez v. Young cty., Tex.*,
    956 F.3d 785, 793 (5th Cir. 2020) ......................................80

*Santibanes v. City of Tomball, Texas*,
    654 F.Supp.2d 593, 613 (S.D.Tex. 2009) ...........................79

**Cases**                                                       **Pages(s)**

*Simmons v. United States*,
   390 U.S. 377 (1968) ......................................................................45

*Spence v. State of Washington,*
   418 U.S. 405 (1974)...............................................37, 45, 75, 77

*Tarver v. City of Edna*,
   410 F.3d 745, 751 (5th Cir. 2005) ..................................................67

*Tennessee v. Garner,*
   71 U.S. 1, 7-22 (1985) .............................................................67, 68

*Thomas v. Collins*,
   323 U.S. 516 (1945)...............................................................44, 45

*Tolan v. Cotton,*
   134 S.Ct. 1861 (2014)....................................................................42

*Trent v. Wade,*
   776 F.3d 368 (5th Cir. 2015) ........................................................42

*Turner v. Driver*,
   848 F.3d 678 (5th Cir. 2017)....................................................43, 44

*United States v. Armstrong,*
   517 U.S. 456 (1996).......................................................................77

*Virginia v. Black,*
   538 U.S. 343 (2003).......................................................................43

*Wilkinson v. Powell*,
   149 F.2d 335 (5th Cir. 1945) .........................................................41

*Westfall v. Luna,*
   903 F.3d 534, 544 (5th Cir. 2018) ................................................65

*Williams v. Bramer,*
   180 F.3d 699 (5th Cir. 1999) ........................................................68

**Constitutional Provisions, Statutes, and Rules**                    **Pages(s)**

U.S. Const. amend. I ................................................................43

28 U.S.C. § 1291 ....................................................................12

28 U.S.C. § 1331 ....................................................................12

42 U.S.C. § 1983 ....................................................................12

Fed. R. App. P.4 ....................................................................12

Fed. R. Civ. P. 56(a) ..............................................................35

Fed. R. Civ. P. 56(c) ..............................................................41

**Other Authorities**                                          **Pages(s)**

Tex. Const. art. 1 § 23 ...........................................................................22, 37

Tex. Penal Code § 38.15(a)(1) ...................................................................... 64

Tex. Penal Code § 38.15(d) ........................................................................... 64

Tex. Penal Code § 42.01(a)(8) (effective Sept. 1, 2013) ............................ 56

Tex. Penal Code § 46.02 ..........................................................................22, 37, 65

Tex. Penal Code § 46.03 ...........................................................................22, 37

Tex. Penal Code § 46.035 .....................................................................22, 37, 71

Tex. Gov't Code § 411.172 ........................................................................22, 37

Tex. Gov't Code § 411.172(a)(9) ..............................................................22, 37


Local Gov't Code § 229.001(d) .................................................................22, 37


Olmos Park, Tex., Ordinance ch. 24, art. IV., § 24-85 (1985) ........................*passim*

# **JURISDICTIONAL STATEMENT**

This case is brought pursuant to 42 U.S.C. § 1983, based on Plaintiffs-Appellants' claims for relief for civil rights violations under the First, Fourth, and Fourteenth Amendments of the United States Constitution.[1]  The District Court had federal question jurisdiction pursuant to 28 U.S.C. § 1331.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because the District Court issued an order resulting in entry of a final judgment which fully and finally disposed of all claims against all parties by granting summary judgment as to the claims of Defendants-Appellees against Plaintiffs-Appellants and denying partial summary judgment as to the claims of Plaintiffs-Appellants against Defendants-Appellees.[2]

Plaintiffs-Appellants timely noticed this appeal on October 14, 2022.  Fed. R. App. P. 4.[3]

---

[1] ROA.22-44.
[2] ROA.1267.
[3] ROA.1348-1351.

# STATEMENT OF THE ISSUES

1.    Whether on March 27, 2018, Plaintiffs-Appellants were engaged in First Amendment protected speech.

2.    Whether the District Court erred in holding that Plaintiffs-Appellants lose all First Amendment rights by displaying firearms.

3.    Whether the District Court erred in granting Defendants-Appellees' Summary Judgment when summary judgment evidence raises genuine issues of material fact as to Defendants-Appellees' "squashing" Plaintiffs-Appellants' First Amendment right to engage in symbolic and political speech as they peacefully protested a local ordinance that banned the carrying of certain firearms that are allowed by Texas law.

4.    Whether the District Court erred in granting Defendants-Appellees' Summary Judgment, when summary judgement evidence and the reasonable inferences to be made therefrom in Plaintiffs-Appellants' favor raise material fact issues regarding whether the conduct of Defendants-Appellees violated Plaintiffs-Appellants' clearly established rights under Section 1983.

5.    Whether the City of Olmos Park ratified Chief Valenciano's policy to "squash the rebel," subjecting it to *Monell* liability by failing to curtail Chief's retaliatory actions depriving activists, including Everard and Grisham, of their First Amendment and Fourth Amendment rights.

# INTRODUCTION

In Texas, American citizens that openly carry firearms are permitted to participate in peaceful protest. Olmos Park, however, through its police department, view these citizens as having an anti-government message—part of a "rebel." Therefore, Olmos Park implemented a policy, practice, and custom of "squashing the rebel" by subjecting open-carrying citizens to retaliatory excessive force and unlawful seizure in order to chill their protests and silence their message. The City's policy criminalizes speech by declaring the message as "disorderly conduct" because of the lawful display of firearms and cameras.

Plaintiffs-Appellants Christopher Grisham and James Everard, pursuant to this City policy, were subjected to excessive force and false arrest in direct response to peacefully protesting in Olmos Park to challenge the City's ordinance prohibiting the carrying of certain firearms—in direct contradiction to Texas law.

Despite the sizable evidentiary record, the magistrate and district court concluded there were no genuine issues of material fact. The court reached this conclusion after egregiously mischaracterizing facts that Plaintiffs-Appellants were belligerent (facts clearly contradicted by Everard's video,[4] for instance). Then, the court misapplied the law by asserting Plaintiffs-Appellants are deprived of any First

---

[4] ROA.2366. Exhibit J, video.

14

Amendment right because they display firearms—even though Texas law permits their conduct.

The lower court's findings of fact and conclusions of law strains comprehension considering the extensive record. Plaintiffs, therefore, bring this appeal, requesting the opportunity to hold the City, Chief Valenciano, and their officers accountable by a jury of peers.

Grisham and Everard seek reversal of the trial court's dismissal order because a reasonable jury would likely conclude, based on the summary judgment record, that the Police Chief and his Officers, pursuant to City policy, seized Appellants for engaging in constitutionally protected activity and then used greater force than necessary to effectuate those seizures.

# STATEMENT OF THE CASE

### Statement of Facts

On March 27, 2018, Plaintiff-Appellant James Everard calmly stood on the corner of the 4300 block of McCullough Avenue, Olmos Park, down the road from City Hall, smoking a cigarette and holding a phone.  Plaintiff-Appellant Christopher Grisham stood nearby, filming Everard.  Everard and Grisham were peacefully protesting Olmos Park's Ordinance 24-85 ["the Ordinance"][5] which denied individuals their right to open-carry under the laws of Texas.  The Ordinance made it "unlawful for any person, other than a duly authorized peace officer, to carry a loaded rifle or loaded shotgun on any public street within the city."[6]  During the several weeks prior to March 27th, activists made clear the 4300 block of McCullough Avenue was the central location for peacefully challenging this Ordinance.

**<u>Between February 5th and February 10th, 2018</u>**. The City of Olmos Park seized several open-carry activists peacefully protesting the Ordinance at the 4300 block of McCullough Avenue.[7]

---

[5] ROA.3501.
[6] ROA.3501.
[7] ROA.830 at fn. 2, https://www.youtube.com/watch?v=FxgaYsh0cQA (0:44-1:20), 2341-2343.

**On February 13, 2018**.   In response to recent criticism, Chief Valenciano instructed his department to read the entire *Ex parte Poe* [8] opinion.[9]  In *Ex parte Poe*, Chief Justice McKeithen of the Ninth Court of Appeals for the State of Texas quoted Grisham's explanation (as President and Founder of Open Carry Texas, a non-profit gun rights group,[10]) that his "mission" was to "educate Texans on gun rights and secure more meaningful legislation that recognizes our right to keep and bear arms."[11]

**On February 16, 2018**.  Valenciano created a PowerPoint[12] about known open-carry activists and compared them (without basis) to mass murderers and cop killers.[13]

**On February 20-21, 2018**.  Open-carry activists continued assembling on McCullough Avenue challenging the Ordinance.[14]  Olmos Park seized these activists at gunpoint.

**On March 1, 2018**.  Valenciano presented his PowerPoint to local, state, and federal law enforcement officials.[15]

---

[8] *Ex parte Poe*, 491 S.W.3d 348 (Tex. App.-Beaumont 2016).
[9] ROA.2467.
[10] ROA.2469.
[11] ROA.2469.
[12] ROA.3248.
[13] ROA.1941-1943.
[14] ROA.831 at fn. 11, https://youtu.be/IEKMBsJGXME?t=57.
[15] ROA.3268.

17

**On March 5, 2018**.  Valenciano disseminated the PowerPoint throughout the law enforcement community.[16]

**On March 16, 2018**.  Officer Lopez, on McCullough Avenue, seized an activist at gunpoint for carrying a sign criticizing the police while carrying on his hip a holstered rubber training device.[17]   Lopez handcuffed the activist and placed him in the back of patrol vehicle.  After realizing the activist was not armed, Lopez released him but kept his sign.[18]

**On March 17, 2018**.  Grisham learned of recent seizures and  sent a request under the Texas Public Information Act to  Olmos  Park requesting the policy "that describes how officers will respond to individuals lawfully carrying a holstered handgun visibly or concealed."[19]  The City responded that no policy existed.[20]   Also on this day,  Alamo  Heights  dispatch  was  notified  of  potential  upcoming  "2nd Amendment Demonstrations" in Olmos Park and relayed this information to Chief Valenciano.[21]

**On March 19, 2018**.  Alamo Heights informed Valenciano that it received calls about "protestors flooding the area in Olmos Park along with additional 2nd

---

[16] ROA.316-318.
[17] ROA.2340-2343, ROA.832 at fn. 16,
https://www.youtube.com/watch?v=RzkaLIYzB6A&t=11s (1:06-3:08).
[18] ROA.2340-2343.
[19] ROA.2340-2343.
[20] ROA.3305-3306.
[21] ROA.576-577.

18

Amendment folks."[22]  The Alamo Heights Police Chief conveyed dismay about Valenciano ignoring call transfers "from the 2nd Amendment folks expressing their dissatisfaction with recent events."[23]

**On March 22, 2018.**  Chief Valenciano and City Council received an email concerning an Open Carry Texas event planned in Olmos Park on April 7, 2018, called "Olmos Park Firearms Transportation Education Petition for Redress."[24] Valenciano notified Alamo Heights, since they handle Olmos Park dispatch calls.

**On March 23, 2018**.  Olmos Park's City Manager sent an "Olmos Park Police Update Alert" stating: "*During the last two months a group of individuals alleging to be gun activists have been detained and, in some situations, arrested by Olmos Park Police Officers. This specific group also indicates via social media they desire to protest in person somewhere in the city.*"[25]  The Alert acknowledges that "Texas is an 'Open Carry' state which authorizes persons to openly-carry[.]"[26]

**On March 26, 2018**.  Grisham phoned Valenciano.[27]  Grisham asked whether the City's policy was for police to "pull[] their handguns and threaten[] a citizen[.]" The Chief responded, "No . . . obviously that's- that's not anyone's policy." [28]

---

[22] ROA.612.
[23] ROA.646.
[24] ROA.2486-2491.
[25] ROA.562.
[26] ROA.563.
[27] ROA.792-798, 2395-2401, 2382, Exhibit R, video (0:50-5:00).
[28] ROA.792-798, 2395-2401, 2382. Exhibit R, video (0:50-5:00).

Grisham then asked if he visited Olmos Park would he "be forced on [his] face if [he] open-carr[ied] there – at gun point." The Chief averred it was "a very unreasonable question to ask."[29]

Grisham responded: "I'm afraid that you guys are gonna threaten me and put me on my face at gunpoint for doing nothing more than exercising my rights . . . ."[30] Valenciano briefed City representatives about this call.[31]

The Open Carry Texas gathering on March 27, 2018, was a continuation of prior peaceful protests at the 4300 block of McCullough Avenue and, as such, Chief Valenciano and "his Officers"—Ruiz, Lopez, and Viera—*knew* Everard and Grisham were open-carry activists engaged in First Amendment symbolic and political speech protesting the Ordinance.[32] Appellees were aware that earlier protests occurred at the same location; and dispatched relayed: "It looks like it's going to be the Second Amendment People."[33] Further, Valenciano and his Officers knew that open-carry activists were protesting the Ordinance due to calls and social media posts, communications with Grisham, and their own bulletin acknowledging that protests would occur in the area.[34] Valenciano considered Appellants to be

---

[29] ROA.792-798, 2395-2401, 2382. Exhibit R, video (0:50-5:00).
[30] ROA.792-798, 2395-2401, 2382. Exhibit R, video (0:50-5:00).
[31] ROA.3787:11-19.
[32] ROA.3501. Olmos Park City Ordinance 2018-05 (effective March 29, 2018). (On March 29, 2018, Olmos Park city officials came to agree with Everard and Grisham that the Ordinance was bad law and decided "it [was] in the best interest of the City to repeal such provision.").
[33] ROA.2356. Exhibit F, audio (0:57-1:08).
[34] ROA.2386. 86:16-21.

protesting "based on the totality of circumstances [the department] had encountered already."[35]   To that end, Valenciano and his Officers set out to "squash the rebel," causing harm to Everard and Grisham.

Valenciano and his Officers arrested Everard on March 27, 2018, for (i) Interference with the Duties of a Public Servant; (ii) Obstruction of a Passageway/Roadway; (iii) Resisting Arrest; and (iv) Disorderly Conduct-Displaying a Firearm.[36]   Prosecutors rejected all charges, except Interference with the Duties of a Public Servant.   On May 21, 2018, this charge was dismissed for insufficient evidence.[37]   Grisham was arrested for (i) Interference with the Duties of a Public Servant; (ii) Obstruction of a Passageway/Roadway; (iii) Resisting Arrest; and (iv) Assaulting a Peace Officer.[38]   Prosecutors rejected the Resisting Arrest charge but pursued the other charges.   However, all charges were dismissed for insufficient evidence by May 1, 2018.[39]

> **A.    Everard and Grisham Were Engaged in First Amendment Protected Symbolic and Political Speech Utilizing Their Firearms as Expressive Conduct in a Safe and Lawful Manner.**

---

[35] ROA.3551. 193:5-10.
[36] ROA.3500.
[37] ROA.2986.
[38] ROA.3500.
[39] ROA.2987.

The summary judgment record shows Everard's rifle and Grisham's holstered pistol were safely positioned in compliance with Texas law.[40]  Unlike Derek Ty Poe, the defendant in *Ex parte Poe*, who was randomly "traversing" a busy mall,[41] Everard was standing calmly and purposely in one public location.  Poe was carrying an operable AR-15 .223 caliber rifle "harnessed and shouldered" loosely on his back allowing it to move from side to side as he walked through the mall.[42]  Everard's purposely inoperable 22 LR rifle[43] was in the chest slung position, strapped so visibly tightly over his shoulder[44] and resting so high on the front of his body with the barrel of the gun pointed to the ground, that it never moved from that position,[45] nor did he touch the gun.[46]

Even as Valenciano's Officers arrested Everard, they did not remove his rifle.[47]  As he is brought to his knees, his rifle remained snug against his chest.[48]

---

[40] ROA.1216-1254. (Section II (B)) (citing Tex. Const., art. 1 § 23; Tex. Penal Code § 46.02; Tex. Penal Code § 46.03; Tex. Gov't Code § 411.172; Tex. Gov't Code § 411.172(a)(9); Tex. Penal Code § 46.035; Local Gov't Code § 229.001(d)).

[41] *Ex parte Poe*, 491 S.W.3d 351(Tex. App.-Beaumont 2016).

[42] *Id.*

[43] Everard made his rifle inoperable by purposely installing an incompatible magazine of the wrong caliber and size into it to comply with Olmos Park's ordinance restricting loaded rifles within city limits.

[44] ROA.3602. 28:6-8.

[45] ROA.2364. Exhibit I, video (3:15-5:38).

[46] ROA.2364. Exhibit I, video.  Everard carried his rifle in the chest slung position as he knew he had no need to move it or handle it, as it was essentially a demonstrational prop.

[47] ROA.2364. Exhibit I, video (5:24-6:18).

[48] ROA.2364. Exhibit I, video (6:18-6:32).

Since the rifle was strapped so tightly to the front of Everard's body, Ruiz had difficulty pulling the sling over his head.[49]

Grisham's pistol remained holstered and untouched on his left side.[50] Grisham held a camera in his left hand to film the protest and interactions.[51] Even as Officers were arresting Grisham, they did not immediately take his pistol away.[52]

Everard's and Grisham's demeanors were designed not to alarm.[53] They stood on the corner and made no sudden movements, including no sudden movements toward any weapon.[54] They communicated, and made their intentions clear that they were out there to protest, even after being handcuffed.[55]

Valenciano and his Officers did not consider the situation dangerous, in that they minimally prevented motorists, bicyclists, or pedestrians from passing through.[56] A motorist even conversed with Grisham and immediately recognized they were peacefully protesting.[57]

Everard and Grisham were in active communication with Officers[58] and informed them repeatedly that their purpose in being there was to protest the

---

[49] ROA.2364. Exhibit I, video (6:18-6:32).
[50] ROA.2364. Exhibit I, video (5:38-6:48).
[51] ROA.2370. Exhibit L, video (2:21-2:38, 5:18-5:32).
[52] ROA.2370. Exhibit L, video (5:42-6:09).
[53] ROA.2370. Exhibit L, video (2:21-2:38, 5:18-5:32). ROA.2364. Exhibit I, video (1:03-5:42).
[54] ROA.2370. Exhibit L, video (2:21-2:38, 5:18-5:32). ROA.2364. Exhibit I, video (1:03-5:42).
[55] ROA.2364. Exhibit I, video (6:05-6:23).
[56] ROA.2364. Exhibit I, video; ROA.2384. Exhibit S, video.
[57] ROA.2364. Exhibit I, video (4:06-4:25).
[58] ROA.2366. Exhibit J, video (0:21-5:41).

Ordinance.[59]  Everard made repeated statements that he was not there to hurt anyone.[60]  Grisham also informed Lopez that he spoke with Chief Valenciano. [61]

Everard and Grisham continued informing Officers they were not there to commit any crime,[62] but to educate police and the public on Texas's open-carry laws.[63]  As the Olmos Park police department had been instructed by Chief Valenciano to read "the entire" *Ex parte Poe*[64] case,[65] Valenciano and his Officers knew that open-carry activists openly carry rifles and pistols to express their belief that people should be allowed to openly-carry firearms.  The purpose of open-carry activists, as Grisham was cited explaining in *Poe*, is "to educate the public, not alarm them" and therefore they "display all their firearms in a safe, non-threatening manner."[66]  Valenciano and his Officers were aware, from the reading of *Poe* that Grisham held a belief that openly-carrying is "immensely important as a [First] Amendment issue as it draws attention and encourages dialogue on [activists'] efforts."[67]

---

[59] ROA.2364. Exhibit I, video; ROA.2370. Exhibit L, video.
[60] ROA.2364. Exhibit I, video; ROA.2370. Exhibit L, video.
[61] ROA.2384. Exhibit S, video (2:17-2:25); ROA.2392. Exhibit W, video (0:02-0:11).
[62] ROA.2392. Exhibit W, video (0:59-3:00); ROA.2364. Exhibit I, video (3:10-3:45).
[63] ROA.2392. Exhibit W, video (0:59-3:00); ROA.2364. Exhibit I, video (3:10-3:45).
[64] *Ex parte Poe*, 491 S.W.3d 351 (Tex. App.-Beaumont 2016).
[65] ROA.2467-2479. On February 13, 2018, Valenciano shared with his Officers the entire *Ex parte Poe* opinion, instructing them to read it.
[66] *Poe*, 491 S.W.3d 348, at 351 (Excerpt from statement by Terry Louis Holcomb, Executive Director of Texas Carry, Inc.).
[67] *Poe*, 491 S.W.3d 348, at 351.

Chief Valenciano knew Grisham and Everard were there to convey a message—one he had to "squash"—because the Ordinance protest was a message of "rebellion."[68]  Valenciano and his Officers omitted any reference in their police reports to this being a continuation of a peaceful protest.[69]  Defendants-Appellees intended to make this about "disorderly conduct" rather than what it really was—chilling the continued protests of the Ordinance.  Valenciano and the City found the message to be "disorderly"—not the conduct.

### B.    Chief Valenciano and his Officers knew Everard and Grisham were engaged in First Amendment protected speech based on their knowledge leading up to March 27, 2018.

The summary judgment record shows Valenciano and his Officers knew Everard and Grisham were open-carry activists engaged in First Amendment protected symbolic and political speech protesting the Ordinance because (i) the March 27, 2018, gathering followed recent protests in the 4300 block of McCullough Avenue which familiarized Valenciano and his Officers with ongoing opposition to the City's open-carry policies; (ii) Valenciano was specifically informed by Grisham on March 26, 2018 that he planned to come to Olmos Park and protest the Ordinance; and (iii) dispatch told them as much.[70]  Prior to this gathering, Valenciano also

---

[68] ROA.3551. 191:17-25.
[69] ROA.3495-3500.
[70] ROA.2382. Exhibit R, video (4:31-9:47); ROA.2384. Exhibit S, video (0:00-0:07).

researched Grisham.[71]   He knew what he looked like and what his purpose was. Valenciano testified that he thought Grisham and Everard were conveying a message of "rebellion . . . based on the totality of circumstances of what [he] encountered already."[72]

### C.   Based on the totality of circumstances, Chief Valenciano and his Officers were objectively unreasonable in believing probable cause existed for arresting Everard and Grisham on March 27, 2018.[73]

The summary judgment record shows that on March 27, 2018, Valenciano and his Officers knew, based on the "totality of circumstances" the department had already encountered,[74] that Everard and Grisham were open-carry activists exercising their First Amendment right to peacefully protest the Ordinance. Valenciano considered Everard and Grisham to be part of a "rebellion [of] armed individuals opposing some type of established government."[75]   Indifferent to Everard's and Grisham's First Amendment right to engage in protected symbolic and political speech, Valenciano continued his policy to "Squash the Rebel."[76]

**At 6:05 P.M. – 6:07 P.M.**   Within minutes of each other, two 9-1-1 callers reported to Alamo Heights that Everard was standing on the corner in the 4300 block

---

[71] ROA.2483-2491.
[72] ROA.3551. 191:17-25, 193:5-10.
[73] *Crostley v. Lamar Cty.*, 717 F.3d 410, 422-23 (5th Cir. 2013).
[74] ROA.3525. 86:17-21 – 87:8-15.
[75] ROA.3551. 191:17-25.
[76] ROA.2404. Exhibit Z-1, video (0:25-1:03).

of McCullough Avenue with—as one described—"an AK47 rifle around his neck,"[77] and the other described as—"an assault rifle on his body slung around his back."[78] Both assured dispatch that Everard was not pointing the gun at anyone.[79] Dispatch relayed this information to Appellee Officers.[80] Valenciano and his Officers learned from dispatch, "It looks like it's going to be the Second Amendment People."[81]

**Lopez arrived on scene at 6:07 P.M.**[82] Lopez arrived and observed Everard standing on the sidewalk with a rifle—barrel down, tightly affixed, high on the front of his body.[83] He noticed that Everard was not touching the rifle but was carrying a camera.[84] Lopez testified it was not a crime to openly-carry nor was it illegal to be in Olmos Park with a rifle.[85] He also did not believe criminal activity was afoot.[86] Nonetheless, he drew his pistol and demanded Everard get on the ground.[87] He never ordered him to disarm.[88] Lopez testified he wanted to detain and disarm Everard because he did not know of his intentions.[89] What Lopez knew was that this was an open-carry gathering to protest the Ordinance, that he and others

---

[77] ROA.2356. Exhibit F, audio, 3702.
[78] ROA.2354. Exhibit E, audio (0:00-0:50), 3702.
[79] ROA.2356. Exhibit F, audio, 3702.
[80] ROA. 2356. Exhibit F, audio.
[81] ROA. 2356. Exhibit F, audio (0:55-1:10).
[82] ROA.3702.
[83] ROA.2384. Exhibit S, video (0:50-1:00).
[84] ROA.3470. 87:12-22.
[85] ROA.3450. 9:20-25 – 3451. 10:1-2. 3456. 33:20-23; ROA.3474. 105:1-4.
[86] ROA.3454. 24:1-4.
[87] ROA.3455. 27:1-12 – 28:20-22.
[88] ROA.2384. Exhibit S, video (1:08-3:00).
[89] ROA.2376. 30:1-22.

recently detained open-carry activists at that same location, that his department had a prior bulletin warning of future protests of the City's open-carry policies, and that, based on his reading of *Poe*, the mission of these activists was to educate the police and the public as to the inconsistencies between the Ordinance and Texas law.[90] Everard also responded to all of his questions.[91] Lopez saw people standing around video recording. He testified that Everard was the only individual he identified with a firearm.[92] Lopez never saw Everard reach for the weapon.[93] However, Lopez thought Everard's conduct was illegal since someone called 9-1-1.[94]

**<u>Viera arrived on scene at 6:08 P.M.</u>[95]** Viera arrived next. He immediately grabbed his department issued AR15, and demanded Everard get on the ground.[96] Viera admits to detaining Everard without any specific articulable facts and did not think criminal activity was afoot.[97] Viera testified, that at the time, he did not think Everard was stoking fear or disorder.[98]

---

[90] ROA. 2384. Exhibit S, video (0:00-1:02); ROA.830 at fn. 2, https://www.youtube.com/watch?v=FxgaYsh0cQA (0:44-1:20); ROA.2341-2343; ROA.831 at fn. 11, https://youtu.be/IEKMBsJGXME?t=57; ROA.832 at fn. 16, https://www.youtube.com/watch?v=RzkaLIYzB6A&t=11s (1:06-3:08); ROA.562-63, 2467-2479.
[91] ROA.2366, Exhibit J, video (0:30-2:00), 2370, Exhibit L, video (0:58-1:45).
[92] ROA.3454. 25:11-23.
[93] ROA.3466. 71:1-6.
[94] ROA.3475. 107:16-25.
[95] ROA.3702.
[96] ROA.3313. 19-21.
[97] ROA.3318. 40-41, 3319. 43-45.
[98] ROA.3325. 68-69.

**Ruiz arrived on scene after Lopez and Viera.**[99]  Ruiz arrived and drew his pistol because he noticed Viera and Lopez with their weapons drawn.[100]  The officers did not communicate, so they were all operating on prior knowledge and the same information from dispatch—that "these were 2nd Amendment people."[101]  Ruiz noticed Everard never touched his rifle but held a camera.[102]  Like Viera, Ruiz testified he lacked articulable facts to suggest criminal activity was afoot.[103]  Ruiz thought he had authority to detain because he was dispatched to Everard.[104]  Sergeant Ruiz, a close confidant of Valenciano, had had recent dealings with open carry activists.[105]  He knew what was occurring.  He observed several people, and after looking at their hands, saw no one with weapons but many with cameras.[106]  Overall, he did not think anyone was being unruly.[107]  Nonetheless, Ruiz thought he could detain Everard because "[h]e was armed" even though being armed in itself was not a crime.[108]

---

[99] ROA.2384. Exhibit S, video (6:20-6:35), 3600. 19:19-22.
[100] ROA.3314. 22:2-19.
[101] ROA.2384. Exhibit S, video (0:00-0:07).
[102] ROA.3314. 23:12-19.
[103] ROA.3599. 14:6-20.
[104] ROA.3599. 14:6-20.
[105] ROA.830 at fn. 2, https://www.youtube.com/watch?v=FxgaYsh0cQA (0:44-1:20), 2341-2343, 831 at fn. 11, https://youtu.be/IEKMBsJGXME?t=57, 832 at fn. 16, https://www.youtube.com/watch?v=RzkaLIYzB6A&t=11s (1:06-3:08), 3606. 44:9-23.
[106] ROA.3313. 20:1-17.
[107] ROA.3313. 20:1-17.
[108] ROA.3603. 32:14-21.

**Chief Valenciano Arrived Last.**[109] Valenciano arrived last. Within a minute of arriving, he tasered Grisham.[110] Valenciano, unlike his Officers, did not have his weapon drawn when he walked up to Everard and Grisham.[111] Valenciano admits lacking specific articulable facts to justify seizing Everard.[112] Even though Valenciano knew why Everard and Grisham were there , he omitted from his report any indication about this being a protest, that there were recent open-carry protests at this same location, or that he gathered information on activists (including Grisham).[113] To bolster his report, Valenciano suggested there were several armed individuals flanking his Officers.[114] However, *none* of these armed individuals were detained or arrested.[115]

After Valenciano approached Everard, the AR-15-wielding Viera aggressively walked to Grisham to stop his filming of the interaction between Everard and Valenciano.[116] Grisham walked backward as Viera tried to grab him for no disclosed reason, and then Valenciano tasered him in the back.[117] Grisham fell backward, slamming his head on the sidewalk.[118]

---

[109] ROA.2364. Exhibit I, video (5:03-5:52).
[110] ROA.2364. Exhibit I, video (5:03-5:52).
[111] ROA.2364. Exhibit I, video (5:20).
[112] ROA 3543. 161:23-25, 3544. 162:1-4.
[113] ROA.3254:1-3281:8, 1764-1779, 2483-2485.
[114] ROA.3540. 146:9-15.
[115] ROA.3495-3500.
[116] ROA.2346-2350, 2392. Exhibit W, video (5:30-6:00).
[117] ROA.2346-2350, 2392. Exhibit W, video (5:30-6:00).
[118] ROA.3522. 75:23-25 – 76:1-2, 2392. Exhibit W, video (5:30-6:00).

### D. Chief Valenciano, Ruiz, Lopez, and Viera caused harm to Everard and Grisham.

The summary judgment record shows that Valenciano, Ruiz, Lopez, and Viera caused harm to Everard and Grisham. The Appellees intentionally stopped Grisham and Everard from engaging in protected speech. Valenciano's tasering of Grisham caused him to fall to the ground and bash his head, causing him to bleed.[119] While on the ground, Viera cuffed Grisham.[120] Viera and Lopez carried Grisham and threw him in the back of Viera's patrol car,[121] with the taser probes still imbedded in his back,[122] and then Viera drove him to the police station.[123]

Ruiz, absent any verbal commands, approached Everard,[124] threw his camera on the ground,[125] cuffed him, and forced him to his knees.[126] Ruiz and Valenciano then "pushed" the handcuffed-Everard face first to the ground.[127] Everard needed shoulder surgery as a result of this episode.[128] Once Everard and Grisham were transported away, Valenciano reported over the radio that he had "Squashed the Rebel."[129]

---

[119] ROA.2364. Exhibit I, video (5:50-6:30).
[120] ROA.2364. Exhibit I, video (6:00-6:25).
[121] ROA.2364. Exhibit I, video (7:05-7:50).
[122] ROA.2370. Exhibit L, video (19:30-20:25).
[123] ROA.2370. Exhibit L, video (7:30-13:00).
[124] ROA.2364. Exhibit I, video (5:58-6:15).
[125] ROA.2364. Exhibit I, video (5:58-6:15).
[126] ROA.2357-2360, 3602. 29:1-21.
[127] ROA.3602. 29:4-17.
[128] ROA.2359 at 9.
[129] ROA.2405. Exhibit Z-1, audio (0:50).

Everard and Grisham suffered psychological damages, pain and suffering, and physical harm. Grisham suffered a concussion, a serious abrasion to the back of his head, aggravated PTSD symptoms, and chronic migraines.[130] Everard suffered ligament damage in his wrist, a fractured thumb, a serious shoulder injury which required surgery and aggravated PTSD symptoms.[131]

---

[130] ROA.2349:14-15 – 2350:16, 2364. Exhibit I, video.
[131] ROA.3386, 3394-3396, 3399-3403.

# PROCEDURAL HISTORY

Plaintiffs-Appellants filed this Section 1983 action on March 25, 2020, asserting nine violations of their civil rights; excessive force (Count 1), unlawful arrest (Count II), unlawfully preventing protected conduct (Count III), retaliation for protected conduct (Count IV), unlawful search and seizure (Count V), failure to intervene (Count VI); deprivation of property (Count VII), failure to provide medical care (Count VIII), and malicious prosecution (Count IX).

The parties filed cross-motions for summary judgment on November 5, 2021. Defendants-Appellees failed to respond to *Plaintiffs' Partial Motion for Summary Judgement*. Plaintiffs-Appellants responded to *Defendants' Motion for Summary Judgment* on November 22, 2021. Magistrate Judge Henry J. Bemporad filed his *Report and Recommendation of United States Magistrate* on July 22, 2022, recommending that judgment be rendered in Defendants' favor, and that Plaintiffs take nothing. Plaintiffs-Appellants filed *Plaintiffs' Corrected Objections to Report and Recommendation of United States Magistrate Judge* on August 5, 2022, objecting to the Judge's mischaracterization of the facts and application of law.

On September 20, 2022, the Honorable Chief Judge Orlando L. Garcia adopted the Report and Recommendation resulting in an order disposing of all claims with respect to all parties. Plaintiffs-Appellants filed their notice of appeal on October 14, 2022.

# SUMMARY OF THE ARGUMENT

Plaintiffs-Appellants James Everard and Christopher Grisham brought this civil rights action against Defendants-Appellees for retaliating against them for exercising their First Amendment right to peacefully protest on March 27, 2018, the City of Olmos Park's Ordinance 24-85. The district court erred in granting Defendants-Appellees Motion for Summary Judgment because there are disputable genuine issues of material fact as to whether Defendants-Appellees violated Plaintiffs-Appellants' constitutional rights pursuant to City policy.

The district court granted Defendants-Appellees Motion for Summary Judgment[132] stating "there was probable cause to arrest the Plaintiffs in this action."[133] Probable cause exists where a police officer has trustworthy "knowledge sufficient for a prudent person, or one of reasonable caution, to believe in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."[134] Probable cause does not foreclose this lawsuit since Grisham and Everard were treated differently from others because of their First Amendment activities.[135]

---

[132] ROA.1265-1266.
[133] ROA.1130-1159, 1266.
[134] *Hogan v. Cunningham*, 722 F.3d 725, 731 (5th Cir. 2013) (quoting *Michigan v. De Fillippo*, 443 U.S. 31, 37 (1979)).
[135] *Nieves v. Bartlett*, 139 S.Ct. 1715, 1727 (2019).

In resolving questions of qualified immunity at summary judgment, a "judge's function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[136]   Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."[137]   When evaluating a motion for summary judgment, courts are required to view all evidence in the light most favorable to the non-moving party and must refrain from making credibility determinations.

The summary judgment record shows that Chief Valenciano and his Officers knew Everard and Grisham were exercising their First Amendment right to engage in symbolic and political speech in continuing a peaceful protest of the Ordinance.

The summary judgment record shows:

1. Valenciano, the City, and Officers were aware of prior, recent protests on the same street.[138]

2. Valenciano and the City previously received calls and communications from people disapproving the City's treatment of activists.[139]

3. Valenciano previously communicated with Grisham.[140]

---

[136] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).
[137] Fed. R. Civ. P. 56(a).
[138] ROA. 621-623, 649.
[139] ROA.576-577, 612, 646.
[140] ROA.792-798, 2382. Exhibit R, video/audio.

4.  Valenciano previously researched Grisham and Open Carry Texas.[141]

5.  Valenciano previously knew Grisham and Open Carry Texas were coming to Olmos Park.[142]  Valenciano previously reported his communications to the City.[143]

6.  Valenciano previously instructed staff to read *Ex Parte Poe* which discussed Grisham's intent and the mission.[144]

7.  Valenciano previously conducted background checks on activists.[145]

8.  Valenciano previously prepared, presented, and disseminated a PowerPoint presentation concerning open carry activists.[146]

9.  The City previously disseminated information concerning knowledge of prior protests, the reality of future protests, while also recognizing that citizens have a right to openly carry firearms in Texas.[147]

10. On March 27, 2018, Everard and Grisham, as open-carry activists, positioned themselves on the public sidewalk—a traditional public forum—with the intent to educate passersby about the inconsistencies between the Ordinance and Texas law.

---

[141] ROA. 2483-2485.
[142] ROA.793-798, 2382. Exhibit R, video (0:41-9:40).
[143] ROA.3787:11-19.
[144] ROA.2467-2479.
[145] ROA.3254:1 – 3281:8, 1764-1779.
[146] ROA.1942-1943.
[147] ROA.562-563.

11. Officers were dispatched to the location of prior protests while being told by dispatch that it was the "Second Amendment people."[148]

12. Everard positioned his purposely inoperable 22 LR rifle[149] in the chest slung position, strapped so visibly tightly over his shoulder and resting so high on the front of his body with the barrel of the gun pointed to the ground, that it never moved from that position, even when walking or being forced to his knees,[150] nor did he ever touch the gun.[151]

13. Grisham's pistol remained in its holster on his left side,[152] in a safe and lawful position without ever touching his gun.[153]

14. Everard and Grisham did not choose to articulate their views through printed or merely spoken words, rather, "the nature of [their] activity, combined with the factual context and environment in which it was undertaken," are "sufficiently imbued with elements of communication to fall within the scope of the First Amendment."[154]

---

[148] ROA.2356. Exhibit F, video (0:56-1:06).

[149] Everard made his rifle inoperable by purposely installing an incompatible magazine of the wrong caliber and size into it to comply with Olmos Park's ordinance restricting loaded rifles within city limits.

[150] ROA.2364. Exhibit I, video (3:15-6:31).

[151] Everard carried his rifle in the chest slung position as he knew he had no need to move it or handle it, as it was essentially a demonstrational prop.

[152] ROA.2364. Exhibit I, video (5:38 – 6:48).

[153] ROA.1178-1215 (Section II (B)) (citing Tex. Const., art. 1 § 23; Tex. Penal Code § 46.02; Tex. Penal Code § 46.03; Tex. Gov't Code § 411.172; Tex. Gov't Code § 411.172(a)(9); Tex. Penal Code § 46.035; Local Gov't Code § 229.001(d)).

[154] *Spence v. State of Washington*, 418 U.S. 405, 409(1974).

15. Valenciano and his Officers arrested Everard and Grisham knowing they were exercising their First Amendment right to peacefully protest the Ordinance. Chief Valenciano acknowledged this when testifying that he disagreed with their viewpoint and, "based on the totality of circumstances [the department] had encountered already,"[155] labeled them members of a "rebel." "The rebel," he testified, was "a group of individuals against the government," — a "rebel" he intended to "Squash."[156]

16. Valenciano and his officers admitted they did not think criminal activity was afoot.[157]

17. No other armed individuals were arrested—only Grisham and Everard as they were the ones vocalizing displeasure with the Ordinance.[158]

18. No law prohibits Everard and Grisham, by legally carrying firearms, from peacefully protesting in a public forum.

A valid arrest requires probable cause with respect to that person unless a constitutionally adequate substitute for probable cause exists.[159] Probable cause was absent here, or in the alternative, it did not apply. Assessing the totality of

---

[155] ROA.3551. 193:5-10.
[156] ROA.3551. 191:17-25.
[157] ROA.3454. 24:1-4, 3455, 3456. 30:1-22, 33:13-16, 3318. 40-41, 3319. 43-45, 3359. 14:6-20; 3543. 161:23-25, 3544. 162:1-4.
[158] ROA.3499.
[159] *Club Retro LLC v. Hilton*, 568 F.3d 181 208 (5th Cir. 2009).

circumstances matters in determining whether Valenciano and his Officers were objectively unreasonable in believing there was probable cause to arrest Everard or Grisham.[160]

The magistrate erroneously marginalizes the totality of circumstances by ignoring the firsthand knowledge of Appellees while also mischaracterizing dialogue between the Officers and Everard.[161]  The totality of circumstances, when viewed properly, demonstrates that Valenciano and his Officers knew Everard and Grisham were not breaking any state or constitutional laws and were engaged in First-Amendment protected symbolic and political speech on March 27, 2018.

The summary judgment record shows that on March 27, 2018, Defendant-Appellees Chief Valenciano, Sergeant Ruiz, Officer Lopez, and Officer Viera retaliated against Plaintiff-Appellants Everard and Grisham for peacefully exercising their First Amendment right to protest the Ordinance.

In addition, the district court erred in dismissing the City of Olmos Park when the summary judgment record shows City Council members and other policymakers received "a lot of emails from second amendment activists regarding the City's unconstitutional ordinance,"[162] were well-aware of the Olmos Park Police

---

[160] *Crostley v. Lamar Cty*., 717 F.3d 410, 422-23 (5th Cir. 2013).
[161] ROA.1130-1159.
[162] ROA.3781-3782

Department's violation of activists' constitutional rights,[163] failed to maintain any complaints or investigations into complaints,[164] and did nothing to curtail Valenciano's policy to "squash the rebel." The City ratified a policy chilling the rights of—and retaliating against—open-carry activists in Olmos Park.

For these reasons, the District Court's granting of Defendants-Appellees' Motion for Summary Judgment should be reversed, and the case remanded with an order directing the district court to set this matter for trial.

---

[163] ROA.3777:8-12.
[164] ROA.3830:3 – 3835:8-23, 3841:7.

# STANDARD OF REVIEW

Summary judgment rulings are reviewed *de novo*.[165]   Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."[166]  "An issue is 'genuine' if it is real and substantial."[167]  "A fact is 'material' if it 'might affect the outcome of the suit under the governing law."[168]  A material fact is in genuine dispute if evidence would allow a reasonable jury to return a verdict for the non-moving party.[169]

To determine whether summary judgment is appropriate, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."[170]  Generally, this Court should "adopt the district court's articulation of genuinely disputed facts when determining whether these disputes are material to a finding of qualified immunity."[171]  This Court cannot review a district court's determination that issues of fact are genuine but may review a determination that the

---

[165] *Cooley v. Housing Auth. of City of Slidell*, 747 F.3d 295, 297 (5th Cir. 2014); *Magee v. Reed*, 912 F.3d 820, 822 (5th Cir. 2019).
[166] FED. R. CIV. P. 56(c).
[167] *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001) (citing *Wilkinson v. Powell*, 149 F.2d 335, 337 (5th Cir. 1945)).
[168] *Bazan*, 246 F.3d 481, at 489 (quoting *Anderson*, 477 U.S. 242, at 248).
[169] *Id.*
[170] *Id.*
[171] *Lemoine v. New Horizons Ranch & Center, Inc.*, 174 F.3d 629, 634 (5th Cir. 1999).

issues of fact are material.[172]   Pleading the defense of qualified immunity shifts the burden to the other party "who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law."[173]   Nevertheless, it is imperative that the Court draw inferences in favor of the non-movant.[174]

Here, the district court failed to view the evidence in the light most favorable to Plaintiffs-Appellants.   By failing to credit evidence that contradicted some of its key factual conclusions, the magistrate "improperly weighed the evidence and resolved disputed issues in favor of the moving party."[175]   Thus, the standard of review is "whether the district court erred in assessing the legal significance of the conduct the district court deemed sufficiently supported for purposes of summary judgment."[176]

Because this is a First Amendment case, this Court has a heightened duty to make an independent examination of the facts "to assure [itself] that th[is] judgment does not constitute a forbidden intrusion on the field of free expression."[177]

---

[172] *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (citing *Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010)).

[173] *Hanks v. Rogers*, 853 F.3d 738, 743 (5th Cir. 2017) (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)).

[174] *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

[175] *Id.* (citing *Anderson* 477 U.S. 242, at 249).

[176] *Kinney v. Weaver*, 367 F.3d 337, 348 (5th Cir. 2004).

[177] *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston* 515 U.S. 557, 567 (1997).

# ARGUMENT

## Plaintiffs-Appellants James Everard and Christopher Grisham Were Engaged in First Amendment Protected Symbolic and Political Speech.

### First Amendment protected speech.

Political demonstrations and protests are protected by the First Amendment.[178]

The First Amendment declares that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble."[179]   The Amendment embodies and encourages "robust political debate,"[180] by protecting both free speech and associational rights.[181]   Protected speech includes freedom of expression, embodied in symbolic speech which refers to expressive or communicative conduct intended to convey a message,[182] political speech which allows for vigorous advocacy of a particular viewpoint,[183] and the very creation of speech[184] which may include the filming of police activity.[185]   This Court held that

---

[178] See *Jones v. Parmley*, 465 F.3d 46, 56 (2nd. Cir. 2006) (citing *Boos v. Barry*, 485 U.S. 312, 318 (1988) (Political protest is "classically political speech" which operates at the core of the First Amendment.").

[179] U.S. Const. amend I.

[180] *Hustler Magazine v. Falwell*, 485 U.S. 46, 51 (1988).

[181] *Id.* (freedom of speech); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460-61 (1958) (freedom of association); *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937) ("The right of peaceable assembly is a right cognate to . . . free speech and . . . is equally fundamental.").

[182] See *Virginia v. Black*, 538 U.S. 343, 358 (2003).

[183] *NAACP v. Button*, 373 U.S. 415, 429 (1963).

[184] *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 792 n.1 (2011). ("Whether government regulation applies to creating, distributing, or consuming speech makes no difference.").

[185] *Turner v. Driver*, 848 F.3d 678 (5th Cir. 2017).

"filming of . . . police officers performing their responsibilities [in a public place] fits comfortably within basic First Amendment principles,[186] and political speech such as filming contributes to the public's ability to hold police accountable and ensures that officers are not abusing their power."[187]   The First Amendment also protects the rights of people to peaceably assemble and petition government for redress of grievances: "The rights to freedom in speech and the rights of the people peaceably to assemble and to petition for redress of grievances, though not identical, are inseparable."[188]

The magistrate erroneously held that Everard and Grisham lost any First Amendment rights by lawfully displaying firearms.[189]   This is baseless, and no reasonable police officer could have believed that exercising both the right to legally carry firearms under Texas law, and the right to protest, meant Everard and Grisham were committing a crime.  It is beyond debate that Everard and Grisham had a legal right to display firearms on that street corner.[190]   The magistrate further opined that displaying a weapon as a form of protest would probably not even be considered symbolic speech.[191]   Certainly, Everard and Grisham intended to convey a message by lawfully displaying a firearm during an open carry protest, and observers would

---

[186] *Turner,* 848 F.3d 678, at 688-89.
[187] *Id.*, at 690.
[188] *Thomas v. Collins*, 323 U.S. 516, 530 (1945).
[189] ROA.1149:5-1152:7.
[190] ROA.1152 at fn. 8.
[191] ROA.1151:17-35.

(and did) understand the message.[192]  Moreover, the United States Supreme Court made clear, long ago, that it is "intolerable that one constitutional right should have to be surrendered in order to assert another."[193]

The district court erred in granted summary judgment in favor of Defendants-Appellees when evidence establishes genuine issues of material fact regarding Everard and Grisham clearly exercising their protected First Amendment right to engage in symbolic and political speech on March 27, 2018.

## B.    Protected speech includes the right to persuade others to change their views.

Protected speech includes the right to persuade others to change their views. The First Amendment "protects the vigorous advocacy, certainly of lawful ends, against governmental intrusion."[194]    As such, the right to condemn police misconduct is indisputably protected.[195]  "[T]o say where the individual's freedom ends and the State's power begins is . . . balanced by the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment."[196]  These First Amendment rights may not be curtailed simply because the speaker's message may be offensive to his audience."[197]

---

[192] *Spence v. Washington*, 418 U.S. 405, 410-11 (1974).
[193] *Simmons v. United States*, 390 U.S. 377, 394, 88 S. Ct. 967, 976 (1968).
[194] *NAACP v. Button*, 373 U.S. 415, 429 (1963).
[195] *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982).
[196] *Thomas v. Collins*, 323 U.S. 516, 529-30 (1945).
[197] *Hill v. Colorado*, 530 U.S. 703, 716 (2000).

1.     The magistrate mischaracterized the speech of Everard and Grisham on
March 27, 2018, as "belligerent," and "taunting" when it was politically protected
speech.   The magistrate erroneously asserted that Everard and Grisham "taunted
Defendants,"[198] were "swearing at the officers,"[199] "began to yell back and swear at
Defendants,"[200] and "were belligerent,"[201] when the record clearly demonstrates that
Everard and Grisham did not "taunt" or "swear at" Valenciano and his Officers or
act belligerently.   The words used by Everard and Grisham is better characterized as
vigorous advocacy for the repeal of Olmos Park's Ordinance.

Everard stated his political position using words such as:

- "How have I broke any laws?"[202]

- "Is the carry of a firearm illegal in the state of Texas?"[203]

- "Because I have not committed a crime."[204]

- "Articulate the law I have broken, and I will get down."[205]

- "In the State of Texas only— only can the House and Senate pass any law that
  pertains to the penal code. Which means under 1-08 no subdivision of the law

---

[198] ROA.1132:3, 2364. Exhibit I, video (2:36-5:25).
[199] ROA.1132:4, 2364. Exhibit I, video (2:36-5:25).
[200] ROA.1145:5-6, 2364. Exhibit I, video (2:36-5:25).
[201] ROA.1145:6, 2364. Exhibit I, video (2:36-5:25).
[202] ROA.2366. Exhibit J, video (0:34-0:37).
[203] ROA.2366. Exhibit J, video (2:07-2:11).
[204] ROA.2366. Exhibit J, video (4:29-4:31).
[205] ROA.2366. Exhibit J, video (2:25-2:29).

can pass any criminal law, which means any law that you may have enacted in your city is unenforceable. 46-02 does not make it illegal to carry a firearm nor a loaded firearm. So, what you're doing right now is holding gun point to a U.S. Army veteran who deployed twice to Iraq, who has never committed a crime in his life, who is doing nothing illegal, and you have three officers holding me at gunpoint because I have not committed a crime. Are you startin' to feel dumb yet?"[206]

Grisham stated his political position using words such as:

- "What crime is being committed here?"[207]

- "So, you have an AR15 in hand, 'cause a man is lawfully carrying."[208]

- "This guy over here's got a pistol because he's lawfully carrying."[209]

- "We told you guys you were going to learn."[210]

- "Today's your education."[211]

- "Today's your education, Corporal."[212]

---

[206] ROA.2366. Exhibit J, video (3:30-4:35).
[207] ROA.2392. Exhibit W, video (1:07-1:13).
[208] ROA.2392. Exhibit W, video (1:15-1:21).
[209] ROA.2392. Exhibit W, video (1:22-1:27).
[210] ROA.2392. Exhibit W, video (1:37-1:40).
[211] ROA.2392. Exhibit W, video (1:40-1:42).
[212] ROA.2392. Exhibit W, video (1:42-1:45).

- "At some point you're going to realize no crime is being committed."[213]

2.    The summary judgment record shows Valenciano and his Officers violated Everard's and Grisham's First Amendment right when they silenced them through seizure and force.    Valenciano's demand that Everard "Get on the ground;"[214] "Get on the ground;"[215]; "I'm telling you one more time to get on the ground;"[216] "I'm not going to tell you again."[217]    Then, as Grisham backed up in response to Viera's aggression toward him, without any verbal demand, tasered Grisham[218] as he continued to advocate for the repeal of the Ordinance, curtailed Grisham's and Everard's First Amendment right to engage in symbolic and political speech.

**II.    The District Court Erred in Granting Defendants-Appellees' Summary Judgment as the Record Establishes Genuine Issues of Material Fact with Respect to Valenciano and His Officers "Squashing" Everard and Grisham's First Amendment Right to Engage in Protected Symbolic and Political Speech.**

**A.    Valenciano and his Officers knew on March 27, 2018, that Everard and Grisham were open-carry activists protesting the Ordinance**

---

[213] ROA.2392. Exhibit W, video (1:48-1:51).
[214] ROA.2392. Exhibit W, video (3:45-3:46).
[215] ROA.2392. Exhibit W, video (3:47-3:48).
[216] ROA.2392. Exhibit W, video (3:49-3:51).
[217] ROA.2392. Exhibit W, video (3:50-3:52).
[218] ROA.2364. Exhibit I, video (5:52-5:54).

The summary judgment record shows on March 27, 2018, Valenciano and his Officers knew Everard and Grisham were open-carry activists protesting the City's open-carry policies set forth in the Ordinance.  Beginning in early February 2018, Valenciano and his Officers detained several open-carry activists in the 4300 block of McCullough.[219]  After several seizures, Valenciano conducted research and compiled a PowerPoint presentation on open-carry activists, including Grisham, that he disseminated to fellow law enforcement agencies.[220]  Further, Grisham notified Valenciano on March 26, 2018, that "open-carry" activists would be in Olmos Park to protest the Ordinance.[221]  Valenciano wants the courts to believe he had no idea who Everard and Grisham were.  This is misleading.

*First*, when Valenciano appeared on scene, he already identified Everard and Grisham as "the Second Amendment People"—meaning open-carry activists—because dispatch had informed him, "It looks like it's going to be the Second Amendment people."[222]

*Second*, Valenciano indicated in his deposition testimony that he had "started doing a background [check]" on open-carry activists and "w[as] able to figure out

---

[219] ROA. 830 at fn. 2, https://www.youtube.com/watch?v=FxgaYsh0cQA (0:44-1:20); 831 at fn. 11, https://youtu.be/IEKMBsJGXME?t=57; 832 at fn. 16, https://www.youtube.com/watch?v=RzkaLIYzB6A&t=11s (1:06-3:08); 2341-2343; 3525. 86:17-21, 87:8-15; 3606. 44:9-23.
[220] ROA.1764-1779, 317-318.
[221] ROA.2396-2401, 2382. Exhibit R, video (4:31-9:47).
[222] ROA.2356, Exhibit F, audio (0:55-1:11), 3550. 187:19-24.

and identify who the[y] were."[223]   In fact, Valenciano became aware as early as February 2018 that open-carry activists, including Open Carry Texas of which Grisham is a founding member,[224] publicly and peacefully opposed the Ordinance because it was inconsistent with Texas law.[225]

*Third*, On February 13, 2018, after detaining several open-carry activists who were arrested despite their lawfully carrying under the laws of Texas, Valenciano shared with his Officers the entire *Ex Parte Poe*[226] opinion, instructing them to read it.[227]  Grisham is identified in *Poe* as the President and Founder of Open Carry Texas, a non-profit gun rights group.[228]  Valenciano and his Officers would have read that the "mission" of Open Carry Texas is to "educate Texans on gun rights and secure more meaningful legislation that recognizes our right to keep and bear arms."[229]

*Fourth*, Valenciano objected to the viewpoint of open-carry activists and in response prepared, presented, and disseminated a PowerPoint depicting open-carry activists as mass-murderers, terrorists, and cop killers.[230]

---

[223] ROA.3552. 195:16-25.
[224] ROA.2469:5-6.
[225] ROA.3525. 86:16-87:15, 192:21-193:4).
[226] *Poe*, 491 S.W.3d 348, at 351.
[227] ROA.2467.
[228] ROA.2469.
[229] ROA.2469.
[230] ROA 1764-1779.

*Fifth*, Once Valenciano received Grisham's open-record request on March 17th, 2018,[231] asking how his Officers were trained to "respond to individuals lawfully carrying a holstered pistol visibly or concealed,"[232] he researched articles about Grisham.[233]

*Sixth*, Grisham personally contacted Valenciano. On March 26, 2018, Grisham called Valenciano to ask about his policy on handling individuals legally open-carrying firearms in Olmos Park.[234] Grisham informed Valenciano he planned to visit Olmos Park, stating: "I'm afraid that you guys are gonna threaten me and put me on my face at gunpoint for doing nothing more than exercising my rights."[235] Valenciano acknowledged during the call he was well-aware that Texas was an open-carry state.[236] Chief Valenciano immediately briefed the City of Olmos Park about this call.[237] Valenciano's current account to the court omits these previous detainments and interactions with open-carry activists in the days leading up to March 27, 2018.

*Seventh*, Valenciano and other City representatives, prior to March 27, 2018, received calls and emails concerning recent events and learned of future protests.[238]

---

[231] ROA.2340-2343
[232] ROA.2480-2482.
[233] ROA.2483-2485.
[234] ROA.792-798.
[235] ROA.2399:1-4.
[236] ROA.2396-2400
[237] ROA.3787:11-19.
[238] ROA. 3525. 86:17-25 – 87:1-19.

This included an email about a Facebook event of a future Olmos Park "education" protest organized by Open Carry Texas.[239]

*Eighth*, prior to March 27, 2018, the Olmos Park City Manager sent out a bulletin to city employees and other acknowledging that there were prior protests, that there would be future protests, and that individuals have a right to open carry.[240]

*Nineth*, Valenciano knew immediately, from prior events, that Grisham and Everard were present on March 27, 2018, to protest the Ordinance.  Because of the prior eight points, he considered them a "rebel" that needed to be squashed.[241]

### B.    Everard and Grisham clearly informed Valenciano and his Officers in loud, clear voices they were there to protest the Ordinance.

The summary judgment record shows on March 27, 2018, when Valenciano's Officers questioned Everard and Grisham, they responded in loud, clear voices that they were there to peacefully protest the Ordinance; they were not there to hurt anyone or commit any crime.[242]

For these reasons, the District Court erred in granting Defendants-Appellees Summary Judgment because the record raises genuine issues of material fact as to Valenciano and his Officers "squashing" the First Amendment rights of Everard and

---

[239] ROA.2486-2491.
[240] ROA.562-563.
[241] ROA.3551. 191:17-25.
[242] ROA.2392, Exhibit W, video (0:00-4:07), 2366, Exhibit J, video (0:22-5:43).

Grisham to engage in constitutionally protected symbolic and political speech as they conveyed the message the Ordinance was inconsistent with Texas law.

> ### III. The District Court Erred in Granting Defendants-Appellees' Summary Judgment Because there are Material Fact Issues Concerning Whether the Conduct of Valenciano and his Officers Violated Everard and Grisham's Clearly Established Rights.

> #### A. The summary judgment record shows that Everard and Grisham were unlawfully arrested.

1.    The summary judgment record demonstrates the arrests of Everard and Grisham on March 27, 2018, were unlawful as it violated his First Amendment right to engage in symbolic and political speech.  A valid arrest requires probable cause unless a constitutionally adequate substitute for probable cause exists.[243]  As the Supreme Court has explained, probable cause is a "practical and common-sensical standard" which uses the "totality of circumstances" to determine whether a person of reasonable caution would believe that the individual had committed the crime for which he is being arrested.[244]  The magistrate's ruling erroneously marginalizes the totality of circumstances showing Valenciano and his Officers were well aware that Everard and Grisham were not breaking any state or constitutional laws and were engaged in First Amendment protected symbolic and political speech.

Valenciano and his Officers knew or should have known on March 27, 2018,

---

[243] *Club Retro LLC v. Hilton*, 568 F.3d 181 208 (5th Cir. 2009).
[244] *Florida v. Harris*, 568 U.S. 237, 243-44 (2013).

that Everard was not breaking any state or constitutional laws and was engaged in First Amendment protected symbolic and political speech because he was (i) calmly standing,[245] (ii) in a traditional public forum on the sidewalk;[246] (iii) on the same street corner where several open-carry protests had recently occurred; [247] (iv) with an inoperable 22 LR rifle,[248] (v) strapped tightly;[249] (vi) "in front of his chest,"[250] (vii) restricting its movement even when walking[251] or being pushed to his knees[252], never touching his rifle [253] (viii) holding a camera in his right hand;[254] (ix) filming police activity;[255] and (x) voicing his opposition to the Ordinance, claiming it unjustly prohibited the open-carry of rifles and shotguns within city limits.[256]

At the time Grisham approached the corner on which Everard was standing,[257] he was lawfully carrying a hip holstered pistol on his left hip for which he had a permit; and in his left hand he held a video camera at eye level filming the police activity; his right arm was held down on the right side of his body, and then swung normally as he walked in front of Everard to stand at least six feet to Everard's right

---

[245] ROA.2364. Exhibit I, video (1:29-6:00).
[246] ROA.2364. Exhibit I, video (1:29-6:00).
[247] See Statement of Facts.
[248] ROA.3359. 48:4-18.
[249] ROA.2364. Exhibit I, video (1:26-1:32).
[250] ROA.2364. Exhibit I, video (1:26-1:32).
[251] ROA.2364. Exhibit I, video (5:51-6:23).
[252] ROA.2364. Exhibit I, video (6:19-6:40).
[253] ROA.2364. Exhibit I, video.
[254] ROA.2364. Exhibit I, video (1:26-1:32).
[255] ROA.2366. Exhibit J, video.
[256] ROA.2366. Exhibit J, video (3:30-4:36).
[257] ROA.2364. Exhibit I, video (2:25-2:40).

side.[258]   At no time did Grisham reach for, intimate he was going to reach for, or touch his pistol.[259]

Once Grisham reached the corner, Viera asked Grisham the following questions and Grisham responded as indicated:

V- "Are you with him?"

G- "Yeah."

V- "Are you here to hurt anybody?"

G- "No."

V- "Do you have a gun?"

G- "Of course I do."

V- "Okay, okay, get away then."

Grisham took a position 10 feet to the right of Everard.[260]

Valenciano and his Officers knew[261] or should have known on March 27, 2018, that Grisham was not breaking any state or constitutional laws and was engaged in First Amendment protected symbolic and political speech when they observed him (i) standing on the same street corner where several open-carry protests had recently occurred; (ii) beside Everard; (iii) lawfully carrying a holstered

---

[258] ROA.2364. Exhibit I, video (2:26-6:45).
[259] ROA.2364. Exhibit I, video (2:26-5:54).
[260] ROA.2364. Exhibit I, video (2:40-2:58).
[261] See Statement of Facts.

pistol on his left hip; (v) holding a video camera at eye level in his left hand; and (vi) filming the public police interaction.

    **2.**    The summary judgment record shows that on March 27, 2018, Everard and Grisham did not engage in disorderly conduct by intentionally or knowingly displaying their firearms "in a manner calculated to alarm," and, therefore, their arrest for disorderly conduct was unlawful. On March 27, 2018, under Texas law, "[a] person commit[ted] an offense if he intentionally or knowingly display[ed] a firearm or other deadly weapon in a public place in a manner calculated to alarm."[262]

    The offense of disorderly conduct under Tex. Penal Code § 42.01(a)(8) requires that "the actor must display the firearm [or other deadly weapon] '*in a manner calculated to alarm*,' and the statute "specifically includes a *mens rea*: it states the person must act *intentionally or knowingly* when he displays a firearm [or deadly weapon] in a public place, and his displaying of the firearm [or deadly weapon] must have been *calculated* to alarm."[263] Penal code section 42.01(a)(8) does not define "manner," "calculated," or "alarm." To clarify the definition of these terms, the *Poe* court "looked to the Webster's Third New International

---

[262] Tex. Penal Code § 42.01(a)(8).
[263] *Lovett v. State*, 523 S.W.3d 342, 347 (Ct. App. —Fort Worth 2017) (quoting *Poe*, 491 S.W.3d 348, at 354 (affirming denial of pretrial habeas-corpus writ and concluding that the statute is neither unconstitutionally vague nor unconstitutionally overbroad).

Dictionary (2002) and presented the meaning of "manner" as the "mode or method in which something is done or happens;" "calculated" as "planned or contrived so as to accomplish a purpose or achieve an effect; thought out in advance; deliberately planned;" and "alarm" as "fear or terror resulting from a sudden sense of danger."[264]

"The statute's requirements that displaying a firearm (or other deadly weapon) must be done 'intentionally or knowingly and in a manner calculated to alarm take the context of the actor's speech into question and require the State to meet a high burden of proving the requisite mental state.'"[265] The *Lovett* court held "the mere presence of a firearm or deadly weapon in public cannot possible supply the requisite *mens rea* for a disorderly-conduct conviction, or else anyone participating in Texas's embrace of lawful open-carry would be guilty the moment he stepped outside his home visibly armed."[266]

The known "objective of open-carry activists is to educate the public, not to alarm it, and this lack of intent to alarm 'is why rifles and shotguns carried by open-carry activists are displayed in a safe[,] non-threatening manner.'"[267]   The *Lovett* court found that "if activists alarmed the public, they would alienate that same public and potentially defeat their own cause."[268]

---

[264] *Lovett*, 523 S.W.3d 342, at 347.
[265] *Id.*, at 348 (quoting *Poe*, 491 S.W.3d 348, at 355).
[266] *Id.*, at 347
[267] *Poe*, 491 S.W.3d 348, at 351.
[268] *Lovett* 523 S.W.3d 342, at 347, fn. 7.

**3.**    The summary judgment record shows that the magistrate erroneously mischaracterized Everard's demeanor and conduct on March 27, 2018, when asserting "Defendants had probable cause to believe Everard was committing" the offense of "intentionally or knowingly display[ing] a firearm or other deadly weapon in a public place in a manner calculated to alarm."[269] On March 27, 2018, Everard, exhibited a nonthreatening, peaceful manner, with an obvious intent to educate the public.  As described above, his demeanor appeared designed not to alarm.[270]   As cars, pedestrians, and bicyclists passed by, he shared with them the injustice of the Ordinance.[271]  Valenciano and his Officers knew[272] Everard was exercising his First Amendment right to engage in symbolic and political speech protesting the Ordinance.

**4.**    The summary judgment record shows the magistrate erroneously asserts that Lopez (i) asked Everard questions about his weapon and intentions; and (ii) repeatedly told Everard to remove his gun."[273]   Contrary to this assertion, the summary judgment record shows Lopez never asked Everard about his weapon[274] or told him to remove his gun.[275]  Upon arriving on the scene, Lopez stepped out of his

---

[269] ROA.1130-1159 at 15.
[270] ROA.2364. Exhibit I, video (1:03-6:16), 2366.
[271] ROA.2366. Exhibit J, video (3:30-4:36).
[272]  See Statement of Facts.
[273] ROA.1131:10-17.
[274] ROA.2384. Exhibit S, video (0:46-6:38).
[275] ROA.2384. Exhibit S, video (0:46-6:38).

patrol car, stood behind the driver's side door,[276] and asked Everard what he had in his hand.[277] Everard replied, "Camera,"[278] and Lopez then ordered Everard to "take a knee and lay face down on the ground."[279] From that point until Valenciano arrived five minutes later, Lopez's words to Everard were different variants of "lay face down on the ground."[280]

    **6.**    The summary judgment record shows the magistrate erroneously asserts that "Everard [was] standing on a street corner with his weapon, refusing to lower it despite the requests of other defendant officers,"[281] and that "[d]efendants attempted to have [Everard] put down his weapon."[282] Contrary to this assertion, the summary judgment records shows Everard (i) was never asked by Valenciano's Officers to lower his weapon;[283] (ii) Everard never moved his inoperable 22LR Rifle from its tightly strapped position on his chest;[284] (iii) Everard never touched his rifle with either of his hands from the time the Officers first observed him to the time

---

[276] ROA.2384. Exhibit S, video (0:45-1:03).
[277] ROA.2384. Exhibit S, video (1:03-1:08).
[278] ROA.2366. Exhibit J, video (0:21-0:27).
[279] ROA.2384. Exhibit S, video (1:08-1:16).
[280] ROA. 2384. Exhibit S, video (1:04-6:03).
[281] ROA.1140:7-10.
[282] ROA.1146:6-7.
[283] ROA.2384 Exhibit S, video (0:46-6:38), 2370, Exhibit L, video (0:53-5:33), 2372, Exhibit M, video (0:33-4:14).
[284] ROA.2364, Exhibit I, video (1:03-6:16), 2370, Exhibit L, video (1:19-2:36), 2366, Exhibit J, video.

Officers removed it from his body.[285]

7.    The summary judgment record shows the error of the magistrate's assertions that, (i) "When instructed to get on the ground, Everard responded 'you lay down on the ground, motherfucker! You lay down on the ground, asshole;'"[286] (ii) "When Defendants arrived at the scene . . . they instructed Everard to get down [on] the ground, but Everard refused [and] began to yell back and swear at Defendants;"[287] and (iii) "[Everard] was loud and belligerent with Defendants when they attempted to ask him questions."[288]    Rather, the record shows, Everard never cursed or yelled foul insults at the Officers.[289]  It was others who used curse words.[290] When Viera arrived, he ordered Everard to "get on the ground," "get on the ground man."[291]   When Everard asked Viera why, Viera replied, "Because you have a weapon."[292]    Viera asked Everard the following questions to which Everard responded:

---

[285] ROA.2364. Exhibit I, video (0:08-6:03), ROA. 2384. Exhibit S, video (0:46-6:36); ROA. 2370 Exhibit L, video (0:55-5:50); ROA. 2372, Exhibit M, video (0:35-4:14); ROA. 2392, Exhibit W, video (0:00-4:16), ROA. 2366 Exhibit J, video.

[286] ROA.1131:16-17.

[287] ROA.1145:3-6.

[288] ROA.1146:5-6.

[289] ROA.1131:16-17. ("When instructed to get on the ground . . . Everard responded 'you lay down on the ground, motherfucker! You lay down on the ground, asshole." ROA. 2364 (1:54- 1:58). (Actually, these words were spoken to the Defendant Officers by a bystander across the street and in front of the strip mall).

[290] ROA.2366, Exhibit J, video; 2384. Exhibit S, video (2:00-2:57).

[291] ROA. 2370, Exhibit L, video (1:00-1:20).

[292] ROA.2364, Exhibit I, video (1:10-1:47), 2370, Exhibit L, video (0:53-1:30), 2366, Exhibit J, video (1:10-1:36).

V- "Are you going to hurt anybody?"

E- "No, I'm not."

V- "Are you a terrorist?"

E- "I am not a terrorist."

V- "Do you want to kill anybody?"

E- "Negative."

Then Viera, ordered, "Get on the ground still."[293]

Everard was never antagonistic, hostile, or threatening toward anyone.

The record shows Everard did nothing on March 27, 2018, that would supply officers with probable cause that his actions were "calculated" to cause "fear or terror resulting from a sudden sense of danger."[294]  Viera agreed.[295]

### B.    Everard and Grisham did not pose a safety threat.

**1.**    The summary judgment record shows Valenciano and his Officers knew[296] on March 27, 2018, that Everard and Grisham were activists protesting the City's open-carry laws and posed no safety threat.   On March 27, 2018, Defendants-Appellees knew "Second Amendment people" were protesting the Ordinance in the 4300 block of McCullough Avenue.[297]   They knew that corner had been the site of

---

[293] ROA.2366, Exhibit J, video (1:35-1:46), ROA.2370, Exhibit L, video (1:30-1:42).
[294] See *Lovett.* 523 S.W.3d 342, at 349; *Poe*, 491 S.W.3d 348, at 354.
[295] ROA. 3313. 21:24-25 – 3314. 22:1-10, 3318. 40:3-19.
[296] See Statement of Facts.
[297] ROA.2403.

several prior peaceful open-carry protests.  Valenciano knew Grisham and others would continue the Ordinance protest.[298]

**2.**     The summary   judgment record shows on March 27, 2018, Valenciano's Officers did not treat the scene as if Everard were causing "the public fear or terror resulting from a sudden sense of danger."[299]   From the time Lopez— the first Officer—arrived on the scene to the time Everard was handcuffed, Valenciano's Officers let pass by the scene over 25 cars, more than 15 pedestrians, 1 bus rider waiting for a bus, and 1 motorcyclist.  Even as the Officers handcuffed Everard, they did not immediately take his 22LR Rifle away.  Everard's 22LR Rifle remained strapped tightly to his chest until after he was handcuffed and pushed to his knees.[300]

**3.**     The summary judgment record shows the magistrate erroneously presented the conduct of Everard and Grisham on March 27, 2018, as causing "the public fear or terror from a sudden sense of danger."

*First*, the magistrate erroneously asserts that on March 27, 2018,  "operators received *calls* regarding a man 'with an AK-47' around his neck;"[301] "after receiving *calls* from citizens that an armed man was standing on a busy street corner;"[302]

---

[298] ROA.3787-3788.
[299] See *Lovett.* 523 S.W.3d 342, at 349; *Poe*, 491 S.W.3d 348, at 354.
[300] ROA.2364. (0:00-6:24).
[301] ROA.1130-1159 at 2.
[302] ROA.1130-1159 at 15

Everard alarmed *passersby* enough to call 911."[303]   Contrary to the magistrate's intimation, dispatch received *two* calls.[304]   Dispatch relayed the all-too-familiar location to Olmos Park police officers.[305]   Dispatch relayed to one of the callers that it was a protest.[306]   The dispatcher also announced over the radio, "It looks like it's going to be the Second Amendment People."[307]   The dispatcher did not indicate that any caller was alarmed.[308]

*Second*, the magistrate erroneously asserts that "Plaintiffs were surrounded by other protestors, who were likewise armed;"[309] "Plaintiffs were engaged in 'armed protest in this case.'"[310]   The magistrate misrepresents the character of the protest on March 27, 2018.   If others were armed, why were they not seized?   The obvious answer is because this was not actually about being armed; but it was the message that Everard and Grisham conveyed.   Everard and Grisham legally carried weapons to peacefully convey that they were open carry activists continuing the protest of the Ordinance; neither touched their firearms, and both were engaged peacefully in constitutionally protected symbolic and political speech with the intent only to protest.

---

[303] ROA.1130-1159 at 17.
[304] ROA.2354. Exhibit E, audio.
[305] ROA.2356. Exhibit F, audio.
[306] ROA. 3886-3887 at 49.
[307] ROA.2356. Exhibit F, audio (0:55-1:06).
[308] ROA.2356. Exhibit F, audio.
[309] ROA.1130-1159 at 4.
[310] ROA.1130-1159 at 21-22.

The summary judgment record raises genuine issues of material fact that on March 27, 2018, Valenciano and his Officers knew Grisham and Everard were not terrorists, they did not want to kill anyone, and they did not want to harm anyone;[311] and that they knew or should have known Everard and Grisham were open-carry activists engaged in First Amendment protected symbolic and political speech protesting the Ordinance.

## C.     Everard and Grisham did not interfere with Officer duties.

**1.**     The summary judgment record shows Everard and Grisham did not interfere with the public duties of Valenciano or his Officers.  An individual commits the offense of interference with public duties when, with criminal negligence, the person "interrupts, disrupts, impeded, or otherwise interferes with . . . a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law.'"[312]   In order to violate the statute, a person's interference must consist of more than speech alone.[313]   Accordingly, "merely arguing with police officers about the propriety of their conduct . . . falls within the speech exception to section 38.15" and thus does not constitute probable cause to arrest someone for

---

[311] ROA.2370. Exhibit L, video (1:30-1:45).

[312] Tex. Penal Code § 38.15(a)(1).

[313] Tex. Penal Code § 38.15(d) ("It is a defense to prosecution under this section that the interruption, disruption, impediment, or interference alleged consisted of speech only.").

interference.[314]

On March 27, 2018, Valenciano and his Officers were not performing a duty imposed or granted to them by law—rather they were violating Grisham's and Everard's rights to peacefully engage in First Amendment protected symbolic and political speech.

**2.**     The summary judgment record raises genuine issues of material fact as to the magistrate's mischaracterization of Everard and Grisham interfering with the duties of Valenciano and his Officers.

*First,* contrary to the facts as presented by the magistrate, Everard was lawfully armed,[315] he did not display his 22 LR Rifle in a calculated way to cause alarm,[316] he was not belligerent,[317] and he stayed calm and compliant as he was handcuffed,[318] forcefully pushed to his knees,[319] and shoved face first to the ground.[320]  The summary judgment record provides no reason for Chief Valenciano

---

[314] *Freeman v. Gore*, 483 F.3d 404, 414 (5th Cir. 2007) (holding that a plaintiff's yelling and screaming at deputies about their right to search her home "alone does not take her conduct out of the realm of speech"); see also *Westfall v. Luna*, 903 F.3d 534, 544 (5th Cir. 2018).

[315] Texas law permits open carry of rights and shotguns, except for places where possession of all guns was prohibited. No permit was required to carry a rifle or shotgun and there was no requirement to conceal them. Tex. Penal Code § 46.02 prohibits the carrying of handguns and certain weapons but does not apply to rifles and shotguns.

[316] ROA.2364. Exhibit I, video (3:15-5:38).

[317] ROA.2364. Exhibit I, video (3:15-5:38).

[318] ROA.2364. Exhibit I, video (6:00-6:40).

[319] ROA.2364. Exhibit I, video (6:00-6:40).

[320] ROA.2364. Exhibit I, video (6:00-6:40).

and his Officers to legitimately believe Everard was interfering with lawful duties or that he was resisting arrest.[321]

*Second*, contrary to the facts as presented by the magistrate when Viera instructed Grisham to get away from Everard, Grisham turned to face Viera as he began to move.[322] It is at that point Viera began to charge at Grisham[323] and Grisham naturally stepped backward as Viera barreled toward him.[324] Viera did not give him any orders or inform him that he was being detained or under arrest. Grisham tried to verbally protect himself against Viera's explosive charge by asking: (i) "What crime am I committing?"[325] (ii) "You have no duties to disarm a law-abiding citizen."[326] and (iii) "I'm not doing anything."[327] Viera did not (i) attempt to instruct Grisham to stand elsewhere; or (ii) tell him he was standing too close.[328] Rather, Viera recognized Grisham was filming the interaction and thought this was interference. He also wanted to comply with Chief Valenciano's policy to "Squash the Rebel." The summary judgment record shows Everard and Grisham did not act with criminal negligence to interfere with the duties of Chief Valenciano and his Officers and did not resist arrest (especially since he was never told he was under

---

[321] See Statement of Facts.
[322] ROA.2364. Exhibit I, video (5:30-5:45).
[323] ROA.2364. Exhibit I, video (5:40-6:00).
[324] ROA.2364. Exhibit I, video (5:40-6:00).
[325] ROA.2364. Exhibit I, video (5:30-5:45).
[326] ROA.2364. Exhibit I, video (5:30-5:45).
[327] ROA.2364. Exhibit I, video (5:30-5:45).
[328] ROA.2364. Exhibit I, video (5:30-5:45).

arrest). Rather, Chief Valenciano and his Officers interfered with the constitutional rights of Everard and Grisham.

### D. Chief Valenciano and his Officers used excessive force which directly harmed Everard and Grisham.

The Fourth Amendment guarantees the right "to be secure in their persons… against unreasonable . . . seizures" of the person.[329] To establish a claim of excessive force under the Fourth Amendment, a plaintiff must demonstrate: (i) injury; (ii) which resulted directly and only from a use of force that was clearly excessive, and (iii) the excessiveness of which was clearly unreasonable."[330] The first element turns on the second and third,[331] which are typically analyzed together according to the factors enunciated in *Graham*.[332]

To establish the first element of an excessive force claim, a plaintiff must prove more than a de minimis injury.[333] "[A]s long as a plaintiff has suffered 'some injury,' even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonable excessive force."[334] The determination of whether a plaintiff's alleged injury is sufficient to support an

---

[329] See *Tennessee v. Garner*, 471 U.S. 1, 7-22 (1985); *Graham v. Connor*, 490 U.S. 386 (1989).
[330] *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005).
[331] *Sam v. Richard*, 887 F.3d 710, 714 (5th Cir. 2018).
[332] See *Hanks v. Rogers*, 853 F.3d 738, 745 (5th Cir. 2017) (analyzing the second and third factors together).
[333] *Tarver*, 410 F.3d at 752.
[334] *Alexander v. City of Round* Rock, 854 F.3d 298, 309 (5th Cir. 2017).

excessive force claim in context-dependent and is "directly related to the amount of force that is constitutionally permissible under the circumstances."[335]

The second and third elements are not governed by a single generic standard.[336] Rather, an assessment of these elements depends on the "totality of the circumstances."[337] In making this assessment, the Fifth Circuit instructed courts to apply the *Graham factors*, which include "(i) the severity of the crime at issue; (ii) whether the suspect poses an immediate threat to the safety of the officers or others; and (iii) whether the suspect is actively resisting or attempting to evade arrest by flight."[338] "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." [339] "Officers [on the scene] must assess not only the need for force, but also "the relationship between the need and the amount of force used."[340] "The timing, amount, and form of a suspect's resistance are key to determining whether the force used by an officer was appropriate or excessive."[341]

The Fifth Circuit emphasized "the reasonableness of an officer's conduct

---

[335] *Ikerd v. Blair*, 101 F.3d 430, 435 (5th Cir. 1996); see *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999) ("In determining whether an injury caused by excessive force is more than de minimis, we look to the context in which that force was deployed.").
[336] *Graham*, 490 U.S. 386, at 393.
[337] *Garner*, 471 U.S. 1, 8-9 (2010).
[338] *Poole v. City of Shreveport*, 691 F.3d 624, 638 (5th Cir. 2012) (quoting *Graham*, 490 U.S. 386, at 496).
[339] Id. (quoting *Graham*, 490 U.S.386, at 396).
[340] *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999); *Deville*, 567 F.3d at 167.
[341] *Joseph on Behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 332-33 (5th Cir. 2020).

under the Fourth Amendment is often a question that requires the input of a jury."[342]

"When facts are undisputed and no rational factfinder could conclude that the officer acted unreasonably," a court "can hold that an officer acted reasonably as a matter of law."[343]  However, when facts are disputed and significant factual gaps remain that require the court draw several plaintiff-favorable inferences," a court "must consider what a factfinder could reasonably conclude in filling these gaps and then assume the conclusion most favorable to the plaintiff."[344]  Because "[e]xcessive force claims are, necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on the facts and circumstances of each particular case."[345]

Here, the summary judgment record establishes genuine issues of material fact as to the magistrate's mischaracterization of the excessive force used by Valenciano and his Officers.  Although excessive force claims are "separate and distinct" from unlawful arrest claims, and courts must analyze a claim for excessive force without regard to whether the arrest itself was justified,[346] the issues of fact, bearing on whether Valenciano and his officers had probable cause to arrest Everard and Grisham in the first place are inextricably bound up with the facts a jury would

---

[342] *Lytle v. Bexar Cnty.*, 560 F.3d 404, 412 (5th Cir. 2009).
[343] *Id.*
[344] *Id.*
[345] *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Graham* 490 U.S. 386, at 396; see also *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (observing that this "area is one in which the result depends very much on the facts of each case").
[346] *Freeman*, 483 F.3d at 416-17.

69

consider in determining whether force was justified in effecting the arrest. Thus, whether Everard and Grisham posed an immediate threat to the safety of the officers or others, actively resisted arrest, or attempted to evade arrest by flight are the basis for both the arrest itself and the Officers' use of force in the arrest.[347] The nature of Everard's and Grisham's contact with Valenciano and his Officers before the arrest create genuine fact issues as to whether the use of force in arresting them exceeded the bounds of the Fourth Amendment.[348] Summary judgment evidence would lead a reasonable jury to conclude that Defendants-Appellees greater force than necessary to effectuate an arrest of Grisham and Everard.

The right to be free from excessive force during an investigatory stop or arrest was clearly established at least as early as August 2007.[349] Whether, the force used against Everard and Grisham violates a clearly established right depends on whether Valenciano and his Officers reasonably perceived Everard and Grisham as a threat at the time force was used.

*First*, Grisham's Claim. The excessive force at issue in Grisham's claim is Valenciano's use of a taser. Contrary to the facts as presented by the magistrate,[350] there were no legitimate weapons-related violations in this situation. Valenciano and

---

[347] See *Graham*, 490 U.S. 386, at 396.
[348] *Deville*, 567 F.3d at 168.
[349] *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012).
[350] ROA.1130-1159, Section IV(A)(1)(a), p. 12 ("The violations at issue are . . . weapons-related offenses, including two Class B misdemeanors, one Class A misdemeanor, and one felony.").

his Officers knew or should have known that Grisham did not commit any crime, and that all he was doing was participating in a peaceful protest.

Under Texas law, as long as an eligible person obtained a concealed handgun license (CHL) from the state, and as long as he kept the license current, kept the pistol concealed or in an open fashion using a belt or shoulder holster, and did not carry it places where it was specifically prohibited, a CHL holder had the right to carry his pistol wherever he went.[351]  Texas law prohibits cities from seizing or confiscating any firearm from an individual who was lawfully carrying or possessing.  Participating in peaceful protest does not turn Grisham's lawful carrying into unlawful carrying.

Contrary to the facts as presented by the magistrate,[352]  Grisham was told to move back[353] and did so;[354] and his right hand never started to cross his chest[355] or go near the handle of his gun[356] which was lawfully holstered on his left hip.[357]  Grisham's left hand still held his camera.[358]  Grisham was never told he was under

---

[351] Tex. Penal Code § 46.035.
[352] ROA.1130-1159. (Section IV(A)(1)(a), at 11) ("Plaintiff Grisham backed away several feet, still filming with one hand, his other hand started to crossed [sic] across his chest, near the handle of his gun, before he lowered it to continue backing away from Viera.")
[353] ROA.2364. Exhibit I, video (5:38-6:48).
[354] ROA.2364. Exhibit I, video (5:38-6:48).
[355] ROA.2364. Exhibit I, video (5:38-6:48).
[356] ROA.2364. Exhibit I, video (5:38-6:48).
[357] ROA.2364. Exhibit I, video (5:38-5:57).
[358] ROA.2364. Exhibit I, video (5:38-5:57).

arrest, he did not flee, and he was not actively resisting at the time he was tasered.[359] Grisham was not a safety threat to Valenciano or his Officers or anyone in the vicinity.   This is attested to by the fact that all charges against Grisham were either denied by prosecutors or dismissed.

The summary judgment record, when considered in the light most favorable to Grisham as a non-movant, shows that Valenciano's tasering constituted excessive force and was unreasonable mainly because as discussed above, Grisham was not committing a crime and therefore not a threat at the time he was tasered.   Grisham was (i) lawfully carrying a holstered pistol on his left hip for which he had a permit; (ii) was lawfully exercising his First Amendment right to film police activity; (iii) was lawfully exercising his First Amendment right to engage in symbolic and political speech; and (iv) did not interfere with the public duties of Chief Valenciano or his Officers.   As a direct result of being tasered and then carried by his arms and legs to the police car, Grisham suffered a serious abrasion to his head, bleeding from his head, a concussion, aggravated PTSD symptoms, and chronic migraines.[360]

*Second*, Everard's claim. The excessive force at issue in Everard's claim is the use of force used to shove him from a kneeling position while handcuffed, face-first into the concrete pavement, and then purposely picking him up in an aggressive

---

[359] ROA.2364. Exhibit I, video (5:37-5:53).
[360] ROA.2346-2350.

manner knowing it would cause injury. While it was perfectly possible for Valenciano and Ruiz to gingerly place Everard on his rear-end or carefully place him on his stomach, they pushed the compliant Everard into a kneeling position while he was handcuffed, then pushed his torso to the ground, and, as his face got closer to the ground, dropped it into the ashy gravel pavement.[361] The Fifth Circuit has held that "it [is] clearly established . . . that pushing . . . a suspect who is neither fleeing nor resisting is excessive."[362]

Due to Appellees' using greater force than necessary toward the handcuffed Everard, he suffered ligament damage to his wrist, a fractured wrist and hand, and a serious shoulder injury, which required intensive surgery and months of recovery.[363] Everard was forced to change occupations as he could not physically perform to the same degree.[364]

The summary judgment record when viewed in the light most favorable to the plaintiffs-appellants shows the force used by Valenciano and his Officers in arresting Everard and Grisham as excessive and objectively unreasonable. Since a dispute exists as to the force used by Valenciano and his Officers, Plaintiffs-Appellants' excessive force claim requires factfinding and

---

[361] ROA 2372. Exhibit M, video (4:04-5:10), 2364. Exhibit I, video (5:58-6:40).
[362] *Sam*, 887 F.3d at 714.
[363] ROA. 2359.
[364] ROA. 2359.

credibility assessments, and accordingly, precludes summary judgment.

### E.    Valenciano and his Officers retaliated against Everard and Grisham for condemning police conduct.

1.    The summary judgment record establishes that Valenciano and his Officers retaliated against Everard and Grisham for exercising their right to condemn police conduct.  The right of every American to condemn police misconduct is indisputably protected under the First Amendment."[365]  "The First Amendment prohibits, not only direct limits on individual speech, but adverse governmental action against an individual in retaliation for exercise of protected speech activities."[366] "If government officials were permitted to impose serious penalties in retaliation for an individual's speech, then the government would be able to stymie or inhibit his exercise of rights in the future and thus obtain indirectly a result that it could not command directly."[367]

To establish a First Amendment retaliation claim, a plaintiff must prove that: (i) he was engaged in constitutionally protected activity; (ii) the officer's action caused him to suffer an injury that would chill a person from ordinary firmness from continuing to engage in that activity; and (iii) the officer's actions were substantially

---

[365] *NAACP v. Claiborne Hardward Co*., 458 U.S. 886, 920 (1982).
[366] *Keenan v. Tejada*, 290 F.3d 252, 258 (5th Cir. 2002).
[367] *Colson v. Grohman*, 174 F.3d 498, 509-510 (5th Cir. 1999).

motivated against his exercise of constitutionally protected activity.[368]  In the context of retaliatory arrests, the Fifth Circuit has mandated that "courts need to be alert to arrests that are prompted by constitutionally protected speech."[369]

Here, Everard and Grisham's symbolic and political views were not articulated through printed or merely spoken words, rather, "the nature of their activity, combined with the factual context and environment in which it was undertaken," are "sufficiently imbued with elements of communication to fall within the scope of the First Amendment."[370]

2.    The record shows the magistrate mischaracterizes the facts as to Valenciano's and his Officers' retaliation against Everard and Grisham.  Contrary to the facts presented by the magistrate, Valenciano and his Officers knew or should have known that Everard and Grisham were not committing crimes and were simply protesting the Ordinance.  They were standing calmly in the same area as recent protests, not touching firearms, filming, and having open dialogue with the officers and local community.  Valenciano, his Officers, and the City were aware of Grisham;[371] recent protests in the area;[372] calls and emails to both the City of Olmos Park and Alamo Heights concerning verbal criticism of recent police conduct and of

[368] *Batyukova v. Doege*, 994 F.3d 717, 730 (5th Cir. 2012).
[369] *Mesa v. Prejean*, 543 F.3d 264, 273 (5th Cir. 2008).
[370] *Spence v. State of Washington*, 418 U.S. 405, 409(1974).
[371] ROA.792-798, 2382. Exhibit R, video/audio.
[372] ROA. 621-623, 649.

future protests;[373] and even dispatch knew this was a Second Amendment protest.[374] Valenciano communicated with the City,[375] his Officers,[376] and the local law enforcement community[377] about what he thought of these protests prior to March 27, 2018. Valenciano considered these events, communications, and inquiries leading up to March 27, 2018, as part of the "totality of the circumstances" when he determined that Grisham and Everard were anti-government individuals that he had to "squash."[378] This was never about disorderly conduct as proscribed in the Texas Penal Code, but about stomping on the "anti-government" message Grisham, Everard, and other activists intended to convey.

**3.** Everard and Grisham sufficiently averred they were deprived of their constitutional and state rights when Defendants-Appellees silenced them through unlawful seizure and excessive force. A required showing of actual injury is not required.[379] Everard's and Grisham's injury is that they were required to curtail their protected speech activities even though they were engaged in constitutionally protected symbolic and political speech and were legally displaying weapons, because Valenciano and his Officers found their message offensive.[380]

---

[373] ROA.630, 640-646.
[374] ROA.2356. Exhibit F, audio (0:57-1:08).
[375] See ROA.3746-3866, *passim.*
[376] See ROA. 3502-3593, *passim.*
[377] ROA. 1763-1779.
[378] ROA.198-199, 3553.
[379] *Keenan v. Tejada*, 290 F.3d 252, 260 (5th Cir. 2002).
[380] *Hill v. Colorado*, 530 U.S. 703, 716 (2000).

Although it would normally be required to demonstrate (1) that the officers' arrests were unsupported by probable cause and (2) that "no reasonable police officer could have believed that probable cause existed,"[381] "a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so."[382]  The Supreme Court has held, in such cases, "an unyielding requirement to show the absence of probable cause could pose 'a risk that some police officers may exploit the arrest power as a means of suppressing speech.'"[383]  To address this discrepancy, the Court concluded that the "no-probable cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech have not been [arrested]."[384]

The record objectively demonstrates that Everard and Grisham are entitled to the *Nieves* exception,[385] since Valenciano puts forth that there were "people that were flanking [his] officers and [himself] who were armed, shouting, and yelling,"[386] but he did not order their seizures.[387] The difference being, Everard and Grisham

---

[381] *Keenan* 290 F.3d 252, at 262.

[382] *Nieves v. Bartlett*, 139 S.Ct. 1715, 1727 (2019).

[383] *Id.* (citing *Lozman v. City of Riviera Beach, Fla.*, 138 S.Ct. 1945, 1953-1954 (2018)).

[384] *Id.* (citing *United States v. Armstrong,* 517 U.S. 456, 465(1996)).

[385] *Id.*

[386] ROA.3553. 199:4-6.

[387] ROA.3495-3500. (There was another person arrested as she was known to the officers for having an outstanding warrant.  She was not armed).

were engaged in constitutionally protected symbolic and political speech, conveying a message Chief Valenciano wanted silenced.

Everard used his inoperable rifle, in the chest slung position, lawfully strapped tightly to his chest, while standing at 4300 McCullough Avenue as a symbol intended to "convey a particularized message," and the "likelihood was great that the message would be understood by those who viewed it."[388] The context in which a symbol is used for purposes of expression is important, for the context gives meaning to the symbol.[389] Here, Everard *is* the symbol, and he is standing in the center of the "town square" along with Grisham conveying the message that Olmos Park's ordinance is inconsistent with the Texas law, and, therefore, Chief Valenciano's enforcement of it is unlawful—a message Valenciano described as "anti-government,[390] and one he intended to "Squash."[391]

For the above reasons, the District Court erred in granting Defendants-Appellees Summary Judgment when the summary judgement record establishes genuine issues of material fact as to Valenciano and his Officers violating Everard's and Grisham's clearly established rights under Section 1983.

---

[388] *Spence v. State of Washington*, 418 U.S. 405, 411 (1974).
[389] *Id.*
[390] ROA.3551-3554.
[391] ROA.3551-3554.

IV.    **The City of Olmos Park Ratified Chief Valenciano's Policy to "Squash the Rebel," Subjecting it to *Monell* Liability, by Failing to Curtail Chief's Retaliatory Actions Depriving Everard and Grisham of their First Amendment Right to Protest.**

To recover a judgment against a city under Section 1983, a plaintiff must allege and establish that he sustained a deprivation of a constitutional or other federally protected right as a result of some official policy, practice, or custom of that governmental entity.[392]  In order for a municipality to be liable for its policies, practices, or customs, a plaintiff must show "either (i) that a policy itself violated federal law or authorized or directed the deprivation of federal rights; or (ii) that a policy was adopted or maintained by the municipality's policymakers with 'deliberate indifference' as to its known or obvious consequences . . . a showing of simple or even heightened negligence will not suffice.'"[393] Facts showing "that [a] City has a policy of turning a blind eye and knowingly refusing to thwart the unconstitutional conduct of its police force," would show a city policy that was the moving force behind its police officers violating  the constitutional rights of its citizens.[394]  "When the official policymaker knows about misconduct yet allegedly

---

[392] *Monell v. Department of Social Services*, 436 U.S. 658, 691-94 (1978).

[393] *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397 (1997); *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

[394] *Santibanes v. City of Tomball, Texas*, 654 F.Supp.2d 593, 613 (S.D. Tex. 2009) (citing *Grandstaff v. City of Borger*, 767 F.2d 161, 170 (5th Cir. 1985)).

fails to take remedial action, this inaction arguably shows acquiescence to the misconduct such that a jury could conclude that it represents official policy."[395]

Here, the City of Olmos Park ratified and embraced Valenciano's policy to "Squash the Rebel," by failing to curtail his First Amendment retaliatory actions against activists protesting the City's open-carry policies. Prior to March 27, 2018, City Council members received "a lot of emails from second amendment activists regarding the City's unconstitutional ordinance"[396] and were well-aware of the Olmos Park Police Department's violation of activists' constitutional rights.[397] The City, however, has no system in place to preserve, for future review, or to investigate complaints made against Valenciano or his police force.[398] The city manager had no problem with the fact that she is the only person with authority to investigate and make "the ultimate decision on [such a] complaint."[399] This entire process is discretionary, not in writing, and not maintained anywhere.[400] The summary judgment evidence shows the City and its Council members were deliberately indifferent to the Valenciano's "Squash the Rebel" policy's inherent violation of open-carry activists' right to engage in First Amendment protected symbolic and

---

[395] *Sanchez v. Young Cty., Tex.,* 956 F.3d 785, 793 (5th Cir. 2020).
[396] ROA.3781:22-24 – 3782:21-23.
[397] ROA.3777:8-12.
[398] ROA.3840:2-12. (The City manager testified no documents exist that would help identify whether or not there were any complaints made against the Chief.)
[399] ROA.3839:15-22.
[400] ROA.3831-3834.

political speech.

The district court erred in failing to find the City of Olmos Park liable under *Monell,* when the facts clearly show the City ratified Chief Valenciano's policy to "squash the rebel," by maintaining deliberate indifference to the policy's known and obvious consequences of depriving open-carry activists of their First and Fourth Amendment rights.

## CONCLUSION

Disputable material fact issues exist. Summary judgement evidence and reasonable inferences made in favor of Plaintiffs-Appellants established disputable issues of material fact with respect to:

(1)    Defendants-Appellees' retaliatory conduct against Plaintiffs-Appellants for lawfully exercising their First Amendment rights which bar officers from claiming qualified immunity.

(2)    The magistrate's minimal, if any, consideration of the "totality of circumstances" shading the Defendants-Appellees qualified immunity claims, which in the interest of justice should fully recognize Appellees' knowledge and understanding prior to the March 27, 2018, protest.

(3)    The magistrate's mischaracterization of the facts from summary judgment evidence, and misapplication of the law, warrant reversal of the District Court's order granting Defendants-Appellees' Summary Judgment.

81

## PRAYER

For the foregoing reasons, Plaintiffs-Appellants respectfully request that this court reverse the District Court's order granting Defendants-Appellees' Motion for Summary Judgment, and grant Plaintiffs-Appellants an opportunity to present the merits of their case to a jury.

*Brandon J. Grable*

**Brandon J. Grable**
Texas State Bar No. 24086983
brandon@g2.law
**Grable Grimshaw, P.L.L.C.**
1603 Babcock Road Suite 280
San Antonio, TX 78229
Telephone: (210) 963-5297
Facsimile: (210) 641-3332
**ATTORNEY FOR
PLAINTIFFS-APPELLANTS**

# CERTIFICATE OF SERVICE

I certify that on March 15, 2023, I electronically filed the foregoing document with the Clerk of the Court for the Fifth circuit, using the electronic case filing ("ECF") system of the Court. All counsel of record were served via electronic service through the ECF system.

Denton Navarro Rocha Bernal & Zech
A Professional Corporation
2517 N. Main Avenue
San Antonio, Texas 78212
Telephone: (210) 227-3243
Facsimile: (210) 225-4481
PATRICK C. BERNAL
pbernal@rampagelaw.com
Texas State Bar No. 02208750
ADOLFO RUIZ
Texas State Bar No. 17385600
aruiz@rampage1aw.com
***Attorneys for Appellees***

/s/ *Brandon J. Grable*
Brandon J. Grable

**Date:   March 15, 2023**

# CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1:  this document contains 12,695 words.


2.    This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because:  this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman font, size 14.


/s/ *Brandon J. Grable*
Brandon J. Grable